C. N. CARSON v. R. J. HAWLEY.[1]

January 8, 1901.

Nos. 12,274—(100).

**Fraudulent Conveyance.**

A scheme by an insolvent debtor and a preferred creditor to dispose of the entire stock of such debtor, to put the purchase price into a homestead for the benefit of the debtor, and fraudulently apply the balance to pay the creditor, is not legally justifiable, so far, at least, as the preferred creditor is concerned.

**Fraud—Inadequacy of Price.**

While a creditor has the right to purchase the entire stock of his debtor according to honest business methods, gross inadequacy of price

[1] Reported in 84 N. W. 746.

paid by such creditor is a badge of fraud, and may furnish reasonable grounds of suspicion of the good faith of such transaction, the proper weight of which is a question of fact, to be settled in the usual way.

### Evidence of Conspiracy.

When there has been evidence tending to show a conspiracy to execute a fraudulent design between a debtor and his creditor that would hinder and delay other creditors, the acts of the conspirators, properly confined to the details and execution of such scheme, in the absence of each other, are admissible against all.

### Statements of Conspirators.

Where such individual acts in the execution of the common design are material, the statements in connection therewith of any party thereto, characterizing such acts, are also admissible in evidence as to all.

### Witness—Production of All Accounts, Books, etc.

A witness, in response to a subpœna, cannot be required to produce all his books, papers, and checks for a substantial period of time, in response to an omnibus demand for the same in such subpœna, and a refusal to comply with such a demand does not furnish evidence that can be properly used against the party refusing to do so on the trial of an action.

### Trial—Evidence—Exception—Review.

When, in the progress of a trial, the court has received or excluded evidence, to which ruling a definite exception had been interposed, it is not necessary for the party claiming injury by such ruling to renew and continue such exceptions to evidence of the same character, from the same witness, in reasonable connection therewith, to avail himself of the alleged error upon review in this court.

Action in the district court for Pine county against defendant as sheriff of said county to recover $5,000 damages for conversion. The case was tried before Crosby, J., and a jury, which rendered a verdict in favor of plaintiff for $102. From an order denying a motion for a new trial, plaintiff appealed. Reversed.

*Clapp & Macartney,* for appellant.

A conveyance is not fraudulent as against creditors which prefers creditors. Smith v. Deidrick, 30 Minn. 60; Berry v. O'Connor, 33 Minn. 29; Bannon v. Bowler, 34 Minn. 416; Dow .v. Sutphin, 47 Minn. 479. The intent to move upon the farm and establish thereby a homestead exemption so that the property could not be

reached by his creditors was not such a fraudulent intent on the part of Crittenden as would avoid this sale. King v. Gotz, 70 Cal. 236; Fitzell v. Leaky, 72 Cal. 477; McCracken v. Harris, 54 Cal. 81; Sullivan v. Hendrickson, 54 Cal. 258; Hawthorne v. Smith, 3 Nev. 182; North v. Shearn, 15 Tex. 174; Chase v. Swayne, 88 Tex. 218; Finn v. Krut, 13 Tex. Civ. App. 36; Bell v. Beazley, 18 Tex. Civ. App. 639; Jacoby v. Parkland D. Co., 41 Minn. 227; Horton v. Kelly, 40 Minn. 193; Miller v. McCarty, 47 Minn. 321; Blake v. Boisjoli, 51 Minn. 296. It was insinuated on the trial that the alleged "conspiracy" was one whereby R. P. Smith & Sons Co. through plaintiff were to purchase the goods, pay their own debt out of the price, and pay the balance over to Crittenden. While there is no evidence of any such thing, if it had been true it would not have avoided this sale. Francis v. Rankin, 84 Ill. 169; Dudley v. Danforth, 61 N. Y. 626; Knower v. Central, 124 N. Y. 552.

Acts or declarations of the vendor, made or done after the sale, can never be introduced for the purpose of defeating it or impeaching his vendee's title. Burt v. McKinstry, 4 Minn. 146 (204); Derby v. Gallup, 5 Minn. 85 (119); Scott v. King, 7 Minn. 401 (494).

Mere inadequacy of consideration is not per se fraudulent unless so gross as to shock the moral sense. Jaeger v. Kelley, 52 N. Y. 274; McFadden v. Mitchell, 54 Cal. 628; Shay v. Wheeler, 69 Mich. 254; Mathews v. Reinhardt, 149 Ill. 635; Bierne v. Ray, 37 W. Va. 571; Fuller v. Brewster, 53 Md. 358; Motley v. Sawyer, 38 Me. 68; Doughten v. Gray, 10 N. J. Eq. 323, 330; Sherman v. Hogland, 73 Ind. 472, 477.

*Palmer & Beek* and *McLaughlin & Boyesen*, for respondent.

If a debtor, knowing himself to be hopelessly insolvent and without sufficient property to pay all his indebtedness, conspires with a creditor and with others secretly and hurriedly to dispose of all his unexempt property, worth $7,000, for $2,575, or any sum which may be offered for it, for the purpose of preventing his other creditors from collecting their claims or any part thereof, and such conspiracy is carried into effect, this is a fraud on the debtor's unfavored creditors; and it matters not whether the proceeds of the sale are used to pay the claim of the preferred

creditors, or held and secreted for the purpose of paying off a mortgage on a homestead, or both, or for any other purpose. Wait, Fraud. Conv. (3d Ed.) §§ 232, 234, 239, 376; Hanson v. Bean, 51 Minn. 546. An insolvent debtor has no right to give away any portion of his property with the deliberate intent of placing it temporarily or for all time beyond the reach of his creditors. Camp v. Thompson, 25 Minn. 175; Filley v. Register, 4 Minn. 296 (391); Lathrop v. Clayton, 45 Minn. 124; Fish v. McDonnell, 42 Minn. 519; Solberg v. Peterson, 27 Minn. 431; Fisher v. Shelver, 53 Wis. 498; Bickler v. Kendall, 66 Iowa, 703; Bartles v. Gibson, 17 Fed. 293; Doughten v. Gray, 10 N. J. Eq. 323, 330; Craver v. Miller, 65 Pa. St. 456; Motley v. Sawyer, 38 Me. 68; Hudgins v. Kemp, 20 How. 45, 50; Jacoby v. Parkland D. Co., 41 Minn. 227; Haven v. Richardson, 5 N. H. 113, 127.

LOVELY, J.

N. A. Crittenden, a merchant at Pine City, having a stock of merchandise, consisting of clothing, furnishing goods, boots, and shoes, of the value of $7,000, was hopelessly insolvent. Among his creditors was the R. P. Smith & Sons Company, of Chicago, which held a claim against him for $679 then overdue. A general agent of the Smith Company (J. P. McMannis) called upon the debtor to secure payment. Crittenden was unable to meet this demand, and McMannis, according to the testimony of Crittenden, then proposed that the latter should sell his entire stock to a purchaser whom the Smith Company would procure for him, when he could pay its claim, and, as suggested by McMannis, take up a mortgage of $2,000, which was then a lien upon a farm owned by Crittenden and wife (but not occupied by them), for the purpose of securing the same as a homestead. After this interview between Crittenden and McMannis, the latter left the Smith Company claim with an attorney, and returned to Chicago.

A day or two afterwards Edward E. Smith, the head of the Smith Company, telegraphed plaintiff, who lived at Knoxville, Illinois, to come to Chicago, as they had a business "proposition" or "opportunity" for him. Plaintiff answered in person, arriving in Chicago in the afternoon, where he remained three days, hav-

ing several interviews with Smith. On the day of his arrival he called at the office of the Smith Company, and made an appointment for a meeting next morning, at which time he had an interview with McMannis, and whatever arrangements were made for future dealings with Crittenden, on plaintiff's claim, were conducted at that time. Plaintiff then obtained three cashier's checks, one of $2,000 and two of $300 each, from the Illinois Trust & Savings Bank, and on the night following left Chicago for Pine City. McMannis accompanied him on the train to St. Paul, where plaintiff left him to go to Pine City. Before plaintiff left St. Paul, McMannis gave him a symbolic memorandum, signed "C. A. N." (Crittenden's initials reversed), under which was drawn a line, and the name "Jones" written beneath. This was given for the purpose of introducing plaintiff to Crittenden.

On the arrival of plaintiff at Pine City, he called upon the attorney who held the claim of the Smith Company, and then went to the store of Crittenden, and, after a short conversation, handed him the "C. A. N." memorandum. A talk ensued relating to the purchase of the entire stock of the debtor. An invoice was taken that night, when the value of the stock was estimated at $5,700. Shortly afterwards the plaintiff offered Crittenden $2,575 in cash for the same. Crittenden haggled, and demanded more, but the plaintiff made this offer his ultimatum, and the trade was closed. The stock was turned over to plaintiff, who entered immediately into possession, made some slight additions to the value of about $100, and proceeded to sell the same at low prices, until December 1 following, when, upon a writ of attachment issued at the instance of an unpaid creditor of Crittenden, the sheriff seized the unsold portion of the merchandise remaining in the store, amounting to about $4,000, upon the claim that the sale from Crittenden to plaintiff was fraudulent as against his unpaid creditors.

This action is brought against the sheriff by plaintiff to recover the value of the goods so taken. The plaintiff recovered $102, the value of the attached property which he had placed in the stock after taking possession. By this verdict the sale was necessarily found to be fraudulent as against the attaching creditor, except as to the goods concededly owned by plaintiff. Plaintiff moved

for a new trial, which was denied, and from such order appeals.

Immediately after the sale and transfer of the goods to the plaintiff, Crittenden turned over to the attorney of the R. P. Smith Company, who was also his own attorney, the two $300 cashier's checks, and paid him the balance of his indebtedness to that company. Plaintiff also gave the same attorney the $2,000 draft, which was deposited in the Rush City Bank, where it was held for Crittenden's benefit for a short time, when it was applied in the extinguishment of the mortgage on the eighty acres owned by Crittenden and wife, upon which they moved soon after, and have held it ever since as their homestead. After plaintiff left McMannis at St. Paul, the latter went to the Nicollet House, in Minneapolis, and registered under the name of James P. Byrnes, where he received a telegram from plaintiff at Pine City, informing him that the trade was closed.

The contention of defendant at the trial, which may have been adopted by the jury, was that the Smith Company was the purchaser in fact of the Crittenden stock; that through their representative (McMannis) they induced their debtor to dispose of his entire stock of goods at a grossly inadequate price, but sufficient to enable him to pay the debt due the company, and secure for himself a homestead by applying the balance of the purchase money to pay off the mortgage thereon; and that plaintiff, in the alleged fraudulent scheme, was also acting for the Smith Company, who might be interested not only in securing its debt, but in the profits of the enterprise.

Since there must be a new trial for the error hereafter referred to, we refrain from discussing other evidence to support defendant's claims, either in detail or as to its general weight and effect, for the reason that we are of the opinion that upon the whole record, excluding testimony improperly received, there was evidence fairly tending to support the verdict, and the jury had the sole right to determine the question at issue, viz. whether the stock of merchandise turned over by Crittenden to plaintiff was purchased by the latter with the intent to hinder, delay, and defraud the unpaid creditors of the vendor.

It was earnestly contended by plaintiff that the application of

82 M.—14

the $2,000 on the homestead, notwithstanding it converted unexempt into exempt property, and created a benefit when none had previously existed, was a legal right, of which Crittenden might avail himself, and that the alleged scheme of McMannis in that regard was legitimate and proper. Conceding, without deciding, that Crittenden had the right to convert his unexempt into exempt property, under the circumstances, the exercise of such right by Crittenden does not justify a fraudulent purpose on the part of the agent of the Smith Company, who made the proposition to do so, and aided in accomplishing that object. If Crittenden had the right to take the avails of his unexempt property and create a homestead, such right would inure solely to the benefit of the debtor, and should not advantage the importunate creditor who devised the scheme; and it follows that such plan, to put the entire property of Crittenden beyond the reach of other creditors, is, so far as the Smith Company and their alleged middleman, the plaintiff, was concerned, a badge of fraud, which might properly have had its weight with the jury in determining the intent of plaintiff, who had no right to perpetrate a fraud even to secure a legal right for another.

It is urged, also, that the sale of the stock of merchandise by Crittenden for less than one-half of its value, does not, of itself, establish an intent to defraud his creditors by the purchaser. It may be conceded that an insolvent debtor has the right to sell his property for less than its value, and that any person has a legal right to purchase such insolvent's stock, in the way of business, for an inadequate price; but if such price is offered to take advantage of the unfortunate circumstances of the debtor, with intent to hinder and delay his remaining creditors, to secure a benefit for the purchaser, such intent vitiates the sale, the intent of which becomes an issue of fact, of which the jury must be the arbiters, and such facts are a badge of fraud, from which such wrongful intent may be inferred. While the secret arrangements between McMannis, Carson, and Crittenden, in connection with other facts detailed in the evidence, tend to support a conspiracy between the Smith Company and Crittenden to secure the debt of the company, and place the balance of the property beyond the

reach of other creditors, yet we do not, as we have stated before, deem it our duty to notice particularly the details of such evidence, and they are set forth here no further than necessary to determine the legal questions raised on this appeal. The explanations of plaintiff as to the motive of these transactions, and his claim that the trade was fair and honest, might or might not be adopted by a jury. To a certain extent, in this case, such claim depended upon the credibility of plaintiff's testimony, and we should not have interfered with a verdict in his behalf, but we are not at liberty to accept his contention in that respect against the verdict.

At the trial evidence was offered by defendant, and received over plaintiff's objection, showing the disposition of the $2,000 draft retained by Crittenden, who gave the same to his attorney (also the attorney of the Smith Company), as suggested before. Crittenden, who was a witness for defendant, testified that he left the $2,000 draft with such attorney, and was allowed to state, against proper exception, that he requested him to deposit the same in the Rush City Bank, with other statements tending to show the disposition of the same for his own benefit, all of which occurred after the stock was turned over to the plaintiff.

It was urged in behalf of plaintiff that this evidence was prejudicial, for the reason that, the trade having been closed, the acts or statements of Crittenden were incompetent to establish the fraudulent intent of his purchaser. It has been held, in issues of this character, that the vendor cannot, by his admissions or confessions subsequent to an alleged fraudulent transfer, thereby affect the rights of his purchaser (Adler v. Apt, 30 Minn. 45, 14 N. W. 63); but it is also an elementary principle that, where a conspiracy exists to execute an unlawful or fraudulent scheme, the material acts of each conspirator, in the absence of the other, from the inception to the execution of the common design, may be received in evidence, and the testimony in this case did not, in our opinion, go further than this (1 Jones, Ev. § 258, and cases cited; State v. Palmer, 79 Minn. 428, 82 N. W. 685). The claim of defendant was that the Smith Company, through its agent, induced Crittenden to make the transfer, whereby, as one result,

he secured a homestead, and in depositing the $2,000 in the Rush City Bank, where it might not be reached by other creditors, he was carrying out the secret plan of the Smith Company and plaintiff; hence the statements he made with reference to and in connection therewith did no more than characterize his acts in that respect, and were properly admitted against the plaintiff, upon the theory that such acts and statements were identified with and a part of the original fraudulent scheme. Of course, such testimony would not have been proper had there been no evidence tending to show such a conspiracy, but we are satisfied from the record that such evidence existed; and the court, who must, when there is evidence tending to prove an unlawful combination, determine, in the first instance, whether enough has been shown to justify its admissibility, properly received the same in this case.

Previous to the trial, the testimony of Edward E. Smith, the president of the Smith Company, was taken in behalf of the defendant at Chicago, before a notary, and his deposition, when returned, was read at the trial. During the taking of this deposition an effort was made to secure evidence from the books of the Smith Company to connect it directly with the acts of plaintiff at Pine City, and a demand was made upon the witness to produce all the cash books, check stubs, check books, and ledgers of the months of October, November, and December of the year when the Crittenden stock was purchased by plaintiff. The witness emphatically refused to honor this demand, and declined to produce his books and papers covering the business of his company during that period, and they were not furnished for the examination of the defendant. Had this demand stopped with the proceedings before the notary, no injury could have been predicated upon such refusal; but at the trial the deposition of Smith was read in evidence, and the following proceedings before the court occurred at the reading of the same:

"Q. (to the witness). You have not produced any of the books? A. No, sir. Q. You were served with a subpœna to produce them, were you not? Mr. Clapp (before the trial court): That is objected to as irrelevant and immaterial. The Court: Objection overruled. Mr. Clapp: We take exception to this ruling, and also to such other objections as I may make. The Court: That will be

satisfactory. * * * Q. Were you served with any subpœna that required you to produce the cash books of this corporation for six months? A. I was served with a subpœna to produce all our cash books, all our checks, all our stubs of checks, all check books, all ledgers,—I may get one or two of them wrong. In fact, it took in our business during the months of, I think, October, November, and December. * * * Q. Will you produce any of your books? Mr. Clapp (before the court): Objected to as incompetent, irrelevant, and immaterial in this case. Same ruling and exception. A. No, sir."

The exceptions and rulings interposed during the reading of the deposition were before the trial court, and clearly presented to the jury a refusal of the Smith Company to produce, in answer to this omnibus demand, all of the books and papers of the business during the period of three months. Such demand and refusal were repeated during the examination before the notary several times, and were read at the trial. Upon the reading of the deposition, the defendant's counsel did not continue to repeat his objections after the exceptions noted were taken. We do not think this was necessary to raise the question whether such general demand and refusal of the witness was prejudicial. Where testimony is offered of a prejudicial character, and an exception is noted, it cannot be required of the same witness, in sequence thereto, that the party objecting should continually interpose and insist upon similar exceptions, where the court has clearly, as in this case, expressed its purpose not to allow the same, and such ruling upon the exception would only be repeated if insisted upon again. Counsel may well insist upon exceptions for the information of the court as well as the opposite party; but after such information has been given, and the court has indicated its purpose to exclude or allow the testimony, no good purpose can be served at the trial in disturbing the proceedings by a renewal of such exceptions. Otherwise, counsel, depending upon a valid objection, might be required to annoy the court, and to place himself in an unfortunate and prejudicial light before the jury, for his declination to interrupt the course of the evidence in its production at the trial.

If the witness Smith was not required to produce the books and papers of his company as demanded, his refusal to do so was

a clear matter of right, and the reading of such refusal in the deposition, to the jury, could not but be prejudicial to the plaintiff. The very contention that there was a fraudulent conspiracy between the plaintiff, the Smith Company and Crittenden to purchase the stock of the latter would obviously suggest that somewhere in the books of the Smith Company there might be found evidence to support the unlawful arrangement upon which defendant's right to a verdict depended, and it is easy to see how that portion of the deposition admitted over plaintiff's exception would affect the jury, who must determine that question. It may have been the makeweight that determined the result in this case; for it could reasonably be claimed, if such refusal was not justified, that the Smith Company had a well-defined reason for not complying with the demand; in other words, that witness refused to produce evidence which would exonerate or convict his company of the fraudulent conspiracy. We are very clear that a party in an action at law has no right to make any such demand as was declined by the witness in the taking of this deposition.

While it is within the power of the court to require the production of any instrument, paper, or book containing evidence material to the issue, the probable existence of such evidence should be known to the party demanding it, and a description of the same sufficient to apprise the witness of what is demanded, is an essential prerequisite. 1 Thompson, Trials, § 590. To require the production of all the books and papers of any person, of his business, for a period of three months, does not indicate any knowledge on the part of the person demanding a particular piece of evidence, or of any book or paper, desired, and permits the allowance of an improper inquisition into the affairs of the witness, outside of the scope of the inquiry. No party can be allowed to fish for evidence in this way. To permit such a course would deny the privilege of the citizen to protection from improper search and seizure of his papers, in violation of his plain constitutional right in that respect. The refusal of the witness Smith to obey the demand made upon him, under the circumstances above set forth, was justifiable, and the use made of such refusal,

in reading from the deposition offered at the trial, in our view may have been injurious to the plaintiff.

From our examination of the record, we have found no other errors occurring at the trial that require our notice, but for the error indicated in reading the objectionable portion of the plaintiff's deposition a new trial must be granted, the order of the court below is reversed, and the case is remanded for further proceedings.