STATE v. RICHARD JOHN GRUNAU.

141 N. W. (2d) 815.

March 18, 1966—No. 39,573.

316

*Rudy K. Steury,* for appellant.

*Robert W. Mattson,* Attorney General, *William B. Randall,* County Attorney, and *Bertrand Poritsky,* Assistant County Attorney, for respondent.

KNUTSON, CHIEF JUSTICE.

Defendant was convicted by a jury of the crime of assault in the second degree. He appeals from an order of the district court denying a new trial or judgment notwithstanding the verdict, and from the judgment of conviction.

During the early morning of August 31, 1963, one of the state's witnesses, James Wilson, upon returning to his home, noticed a man sitting in a parked car nearby. He went into his house, and later came out to meet a friend. He then noticed a second man get out of the car and walk between some houses and proceed to climb over a fence surrounding the Kline Oldsmobile establishment. He testified that this man was carrying an L-shaped bar and had a gun stuck in his belt. Wilson went to a nearby restaurant and called the police. He gave the police the license number of the car — 5G 7171. He returned to his home and, about 15 minutes after making the first call, he called the police again and informed them that the car had moved from the front of his house to the corner of Pascal and Sherburne, about half a block away.

After the second call, two police cars arrived at the scene and Wilson told them that the automobile had just left, traveling south on Pascal,

with the trunk partially open. Officers Drassal and Doran, who were in one car, proceeded to look for this automobile. The other car was occupied by Detectives Freischel and Opheim.

Drassal and Doran came upon the car near Snelling and University Avenues, and stopped it after it had turned the corner onto Sherburne Avenue. As had been described by Wilson, the car bore license number 5G 7171, and its trunk was partially open. The driver of the car was identified as Donald Moe, who was questioned and then placed in the squad car. The officers observed cartons of cookies and candies, various tools, a carton containing a billfold, a locking mechanism similar to those used on safes, and a box containing some live ammunition in the trunk. Moe told the officers he had borrowed the car from defendant, Richard John Grunau; that he had left Grunau at the State Fairgrounds earlier in the evening and was on his way to pick him up. Apparently Moe did not realize that the trunk of the car was open.

Detectives Freischel and Opheim learned by radio of the apprehension of Moe and arrived on the scene. They observed miscellaneous items in the partially open trunk and then closed it without making a thorough search. They ordered that the car be towed to the public safety garage. Then they returned to the Kline establishment. Freischel began to investigate the premises. He observed that a small service door was ajar. When he stepped through this door he saw a man in the center of the service department and ordered him to stop. Instead of doing so, the man ducked behind an automobile. Freischel fired three shots at him as the man went toward the east end of the building. When the man reached a service door at the end of the building, he fired rapidly four times at Freischel. He then ran out of the Kline establishment and north on Pascal. Freischel went to his police car and radioed for assistance.

Officers Doran and Drassal responded to Freischel's radio communication. As they drove through an alley between Asbury and Simpson they observed a man run across the alley approximately 15 to 20 feet in front of them, running north on Simpson, and disappear between some buildings. Officer Doran, the driver of the car, yelled out of the window for the man to stop, and fired two shots at him. He testified he saw a three-quarter profile of the man's face for a second, and identified de-

fendant, Richard John Grunau, at the trial as the man he had seen run in front of the squad car. He described the man as wearing a blue long-sleeved shirt and light tan trousers. Officer Drassal, who was a passenger in the front seat of the same automobile, could not identify the man who ran in front of the car.

Freischel stated that the man he had encountered in the Kline establishment, with whom he had exchanged shots, was 5 feet 8 or 9 inches in height and stocky, with brown hair in a crew cut. The man who ran in front of the car occupied by Officers Drassal and Doran was not apprehended at that time.

Upon reentering Kline's, Freischel found an automobile facing a large door used as entrance and exit. In the car there were a television set and a number of radios and other articles that had apparently been placed there with the object in mind of removing the car and these articles upon completion of a burglary. The combination locks of two safes had been knocked off. No fingerprints were found on the safes, the tools used to knock off the locks, the automobile, or the items found in it.

Moe was taken to the police station and later the same morning Officers Drassal and Doran and Detective Freischel went to the public safety garage, broke open the trunk of the automobile without a search warrant, and removed from the trunk a box of live ammunition; a billfold found in a box; a locking mechanism; various tools, including a crowbar, several hammers, a wire cutter, chisel, center punch, cold chisel, and screwdriver; and some gloves. All of these items were received in evidence over the objection of the defendant that they were irrelevant and immaterial. Defendant also moved to suppress these items on the ground that they were obtained through an illegal search and seizure. This motion was denied by the trial court.

Prior to the trial, James Wilson had identified the defendant from some "mug shots" as a likeness of the person he had seen climbing the fence. He also picked defendant out of a lineup consisting of four persons, one of whom he knew and the other two of whom were not the same size as the defendant.

During the trial Wilson testified that he had refreshed his recollection concerning the events surrounding the night of the offense. He stated

that he had given an oral statement to the police, and that he had had an opportunity to talk to the county attorney, at which time he reviewed that statement. Defendant's counsel then moved for an order of the court compelling the state to turn over to him any statement given by Wilson relevant to the facts of this case. The court denied defendant's motion. Officer Doran testified that he had made a written report concerning the circumstances surrounding his investigation, and that he had reviewed this report before testifying in a prior prosecution against Donald Moe. He admitted that his review of the report enabled him to call to mind certain facts he had forgotten. Defense counsel demanded that he be permitted to inspect this report, which demand was denied by the trial court.

Detective Freischel testified that he reviewed quite a number of police reports prior to the trial of Donald Moe in refreshing his recollection. The court also denied defendant's motion that these be turned over to defendant.

Defendant then obtained a subpoena duces tecum requiring production of practically all of the records of the police department concerning the charges brought against defendant. On motion of the state the court quashed this subpoena except as to certain radio reports made as the result of transmissions by the police officers of what was transpiring at the time. It was the opinion of the court that these radio reports were not privileged because individuals having shortwave radios could receive them.

While one of the articles taken from the trunk of the car was a box of live ammunition, there was no attempt to show that the empty cartridges found in the Kline establishment were similar to the cartridges found in the automobile. Although a thorough examination of the establishment was made, no fingerprints were found, nor was any other evidence uncovered that would directly connect defendant with the offense.

It developed that the automobile driven by Moe belonged to defendant's father, who lived in Minneapolis. Upon learning from his father that a warrant had been issued for his arrest, defendant voluntarily surrendered to the police. There is no showing as to whether the father

had consented to the use of the automobile by either defendant or Moe or both of them.

In this appeal these questions are presented:

(1) Was it error to deny defendant's motion to suppress evidence seized from the trunk of the automobile without a search warrant?

(2) Was it prejudicial error for the trial court to deny defendant's motion that the state be compelled to turn over to him memoranda and statements used by the state's witnesses?

(3) Did the court err in quashing the subpoena duces tecum?

■ Some aspects of the law pertaining to search and seizure, as we understand it, have recently been discussed in State v. Thompson, 273 Minn. 1, 139 N. W. (2d) 490, and in State v. Holmes, 273 Minn. 223, 140 N. W. (2d) 610, where we review many of the cases dealing with search of an automobile. This case presents still another set of facts where there seems to be no controlling decision. Defendant relies on Preston v. United States, 376 U. S. 364, 84 S. Ct. 881, 11 L. ed. (2d) 777, and State v. Sorenson, 270 Minn. 186, 134 N. W. (2d) 115. In the Preston case the United States Supreme Court held that search of an automobile could not be justified as an incident to a lawful arrest if it was remote in time and place from the arrest and the possibility of destruction of evidence or movement of the car was not present. In the Sorenson case the facts were quite similar and we held that Preston would probably have been controlling if it were not for the fact that the evidence seized was not prejudicial to the defendant.

However, in both of those cases the defendant was in the car when arrested and was in custody when the car was searched. Clearly such a defendant has standing to object.[1] In this case, while there is no direct evidence that Moe was placed under arrest by the officers at the time they intercepted him, he was placed in the squad car and thereafter taken to jail and booked, and the car was towed to the public safety garage where it was located at the time the articles involved were re-

---

[1] We need not decide whether defendant had standing to object because we find here no unlawful search and seizure. However, for a case somewhat similar, see People v. Angevine, 47 Misc. (2d) 374, 262 N. Y. S. (2d) 784.

moved. The question naturally arises, at what point does an arrest occur? Minn. St. 629.32 reads:

"An arrest is made by the actual restraint of the person of the defendant or by his submission to the custody of the officer; * * *."

Arrest was construed in State v. Harris, 265 Minn. 260, 269, 121 N. W. (2d) 327, 334, certiorari denied, 375 U. S. 867, 84 S. Ct. 141, 11 L. ed. (2d) 94, where we stated:

"* * * The arrest took place when the policemen ordered Harris from the car, i. e., when the officers interrupted him and restricted his liberty of movement."

The question then naturally arises whether the arrest was lawful. There is no claim made here that it was unlawful. We think at the time Moe was apprehended the officers had probable cause to believe that he was involved in the contemplated or actual commission of a crime, and it must be held that, as far as the record before us is concerned, the arrest was lawful. Assuming then that the arrest was lawful, the initial search of the automobile would be lawful as an incident to that arrest. At that time Moe was in exclusive possession of the automobile. The search was related to his participation in or connection with a suspected burglary. When the automobile, then in the public safety garage, was later broken open and the articles formerly observed through the open door of the trunk were removed, it was mainly a seizure and not a search.[2] Even then defendant had not been connected with the crime, nor had it been established that he was in actual or constructive possession of the car. There was at that time no invasion of his privacy, unless it be assumed that he had constructive possession of the car because his father owned it. For all that appeared at the time, the car might have been used by Moe, and possibly someone else, for the commission of a crime, without the consent of either defendant or his father; or it might not have been connected with the burglary at all. The only article found in the car and actually traced to defendant was his purse. Assuming that the initial search was lawful as an incident to a lawful arrest, it would

---

[2] See, State v. Huffstutler, 269 Minn. 153, 130 N. W. (2d) 347.

be straining the constitutional proscription against unlawful searches and seizures too much to hold that such search and seizure became unlawful when the articles originally observed were simply later removed. They could have been removed at the time Moe was apprehended and there would then have been no room for any claim that there was an unlawful search and seizure.

If the search and seizure was lawful as to Moe, does it become unlawful as to the defendant because he was not present when the automobile was initially examined? We would think that once the articles seized are lawfully in the possession of the police there is no violation of defendant's right of privacy, and hence no violation of his constitutional right. Any other ruling would make a mockery of police investigations in a case such as this.

In spite of the fact that we believe there was no unlawful search and seizure here, we do think that by this time police departments should be forewarned that if opportunity exists they should procure a search warrant before searching either a house or an automobile. Failure to do so may necessitate retrial of a case when slightly more attention to recent decisions of the courts would indicate how easily such problems may be avoided. The frequency with which we are compelled to review cases involving alleged unlawful searches and seizures leads us to believe that these decisions are either ignored or unknown to investigative officers. Either is no longer excusable.

■ Inasmuch as there must be a new trial, we mention the fact that there may be in this case a serious question of the relevancy of some of the articles found in the trunk.[3] The live ammunition which was removed was not shown to be of the same kind as that used by the individual who fired upon the officer in the Kline establishment. There appears to be lacking foundation for the introduction of some of these articles, and apparently they were intended only for the purpose of creating suspicion in the minds of the jury, rather than to connect defendant with the commission of the crime.

■ In State v. Thompson, 273 Minn. 1, 139 N. W. (2d) 490, we adopted substantially the rule of the so-called Jencks Act (18 USCA,

---

[3] See, State v. Webber, 266 Minn. 224, 123 N. W. (2d) 193.

§ 3500), by holding that pretrial statements of a witness called by the prosecution must be produced for examination by defendant to be used by him for the purposes of impeachment. Adoption of this rule came subsequent to the trial of the case now before us. The state urges that in view of that fact we should not apply the rule retroactively to this case.

The so-called Jencks rule does not involve a constitutional issue but rather the application of a procedural rule.[4]

We think that where the judgment has not become final by expiration of the time for appeal and the record has been sufficiently protected by

---

[4] As to the retroactive application of Jackson v. Denno, 378 U. S. 368, 84 S. Ct. 1774, 12 L. ed. (2d) 908, 1 A. L. R. (3d) 1205, involving the method of determining voluntariness of a confession, see Annotation, 1 A. L. R. (3d) 1251, 1256. As to the retroactive application of Mapp v. Ohio, 367 U. S. 643, 81 S. Ct. 1684, 6 L. ed. (2d) 1081, 84 A. L. R. (2d) 933, involving the fruits of unlawful search and seizure, see Annotation, 84 A. L. R. (2d) 959. In Linkletter v. Walker, 381 U. S. 618, 85 S. Ct. 1731, 14 L. ed. (2d) 601, it was held that Mapp v. Ohio, *supra,* was not to be applied retroactively. In Tehan v. United States, 382 U. S. 406, 86 S. Ct. 459, 15 L. ed. (2d) 453, the court held that the rule of Malloy v. Hogan, 378 U. S. 1, 84 S. Ct. 1489, 12 L. ed. (2d) 653, and Griffin v. California, 380 U. S. 609, 85 S. Ct. 1229, 14 L. ed. (2d) 106, where it was held that comment on the failure of defendant to take the stand was a violation of the Fifth Amendment as made applicable by the Fourteenth Amendment, was not to be applied retroactively. In footnote 3 of the court's opinion, we find the following (382 U. S. 409, 86 S. Ct. 461, 15 L. ed. [2d] 455):

"The Supreme Court of California and the Supreme Court of Ohio have both considered the question, and each court has unanimously held that under the controlling principles discussed in Linkletter v. Walker, 381 U. S. 618, the Griffin rule is not to be applied retroactively in those States. In re Gaines, 63 Cal. 2d 234, 404 P. 2d 473; Pinch v. Maxwell, 3 Ohio St. 2d 212, 210 N. E. 2d 883.

"As in Linkletter, the question in the present case is not one of 'pure prospectivity.' The rule announced in Griffin was applied to reverse Griffin's conviction. Compare England v. Louisiana State Board of Medical Examiners, 375 U. S. 411. Nor is there any question of the applicability of the Griffin rule to cases still pending on direct review at the time it was announced. Cf. O'Connor v. Ohio, No. 281 Misc., O. T. 1965, 382 U. S. 286, December 13, 1965.

"The precise question is whether the rule of Griffin v. California is to be

a proper demand for production of the pretrial statement, it is only fair that the rule be applied if it appears that refusal to do so will result in substantial prejudice to the defendant. On the other hand, where the judgment has become final or the case has been tried without a sufficient demand for production of the statement we will not apply the rule retroactively.

Here the requirements for application of the rule are present. While it may seem unfair to the state to apply a rule adopted subsequent to the trial of the case, it is even more unfair to defendant to deny application of the rule, as long as it can be done within such time as will permit the case to be tried again without substantial prejudice to the prosecution.

■ We come, then, to the question: What kind of statements or reports come within the context of "statements" as used in the rule? In the Jencks Act, 18 USCA, § 3500, we find the following definition:

"(e) The term 'statement', as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means —

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

For want of a better definition, we are inclined to adopt the definition of the Jencks Act.

In Thompson we held the statements involved clearly come within the definition contained in (e)(1). We left open for future determination what else comes within the broader definition of the statements producible under the rule. We are now confronted with (1) oral statements made by the witness Wilson to the police officers; (2) reports made by the police officers to their superior; (3) the entire file of the police

---

applied to cases in which the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari elapsed or a petition for certiorari finally denied, all before April 28, 1965."

department relating to the case; and (4) memoranda used by witnesses to refresh their memories for the purpose of testifying at the trial. We will consider each of these individually.

Decisions from state jurisdictions are not too helpful in determining the scope of the rule. Of the state courts that follow the Jencks rule, 9 of the 11[5] refer to the Jencks Act and seemingly adopt it as a guide, without determining what type of statements come within the rule.[6]

While the lack of discussion of the scope of the rule in state decisions might not indicate an acceptance of Federal decisions, some of which do contain guidelines, it seems that the general trend is to accept Federal decisions in construing this Federal act, even though state courts are not bound by the Federal act or decisions. We look, then, to the decisions of the Federal courts.

In the Federal courts there is little question that any substantially verbatim statement of a government witness is producible even though not adopted or approved by the witness; or, if not substantially verbatim, it is producible if adopted or approved by the witness. In Palermo v. United States, 360 U. S. 343, 352, 79 S. Ct. 1217, 1224, 3 L. ed. (2d) 1287, 1295, the court, after discussing the legislative history of the act, designated some areas where the rule does not apply:

"* * * It is clear from the continuous congressional emphasis on 'substantially verbatim recital,' and 'continuous, narrative statements made by the witness recorded verbatim, or nearly so * * *,' * * * that the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital. * * * We think it con-

[5] Oregon should be added to the states cited in Thompson as following the Jencks rule. See, State v. Foster, 242 Ore. 101, 407 P. (2d) 901.

[6] In re Waltreus, 62 Cal. (2d) 218, 42 Cal. Rptr. 9, 397 P. (2d) 1001; People v. Wolff, 19 Ill. (2d) 318, 167 N. E. (2d) 197; Walker v. State, 78 Nev. 463, 376 P. (2d) 137 (dissent); People v. Rosario, 9 N. Y. (2d) 286, 213 N. Y. S. (2d) 448, 173 N. E. (2d) 881; State v. Hunt, 25 N. J. 514, 138 A. (2d) 1; Commonwealth v. Smith, 412 Pa. 1, 192 A. (2d) 671; State v. Lavallee, 122 Vt. 75, 163 A. (2d) 856; State v. Richards, 21 Wis. (2d) 622, 124 N. W. (2d) 684.

sistent with this legislative history, and with the generally restrictive terms of the statutory provision, to require that summaries of an oral statement which evidence substantial selection of material, or which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent, are not to be produced. Neither, of course, are statements which contain the agent's interpretations or impressions."

The case of Campbell v. United States came before the Supreme Court on two occasions. Campbell v. United States, 365 U. S. 85, 81 S. Ct. 421, 5 L. ed. (2d) 428, and Campbell v. United States, 373 U. S. 487, 83 S. Ct. 1356, 10 L. ed. (2d) 501. The first decision remanded the case to the trial court for a hearing on the question of whether the memorandum of an oral statement would come within the rule. A hearing was thereafter held in the trial court and the case went to the Circuit Court of Appeals, where it was again remanded to the trial court for further hearing. Campbell v. United States (1 Cir.) 296 F. (2d) 527. It then came before the Supreme Court again and it was held that the report of an interview dictated using notes taken at the interview was producible as a written statement made by the witness and adopted by him, since the oral recitation from the notes might fairly be deemed a reading back of the notes, and the interview report might fairly be deemed a copy of the notes. The case of Clancy v. United States, 365 U. S. 312, 81 S. Ct. 645, 5 L. ed. (2d) 574, is to the same effect.

The cases from the Federal Circuit Courts of Appeal are annotated in 5 L. ed. (2d) 1014.[7] Some of the statements from that annotation may be helpful. We find the following (5 L. ed. [2d] 1025):

"* * * The evident purpose of the statute is to limit the right of inspection for use in cross-examination to reasonably accurate or authenticated statements and reports, for which the government witness, not the government agent (making the report), is responsible.

* * * * *

---

[7] For pertinent cases on the question decided subsequent to the annotation, see Lewis v. United States (8 Cir.) 340 F. (2d) 678; United States v. Johnson (4 Cir.) 337 F. (2d) 180; Mims v. United States (10 Cir.) 332 F. (2d) 944; Home News Pub. Co. v. United States (5 Cir.) 329 F. (2d) 191.

"Only a 'substantially verbatim,' not a precisely verbatim, recital of a government witness' pretrial oral statement is required. * * * What is meant is that the statement should give the substance of what a government witness said and, so far as the substance is concerned, substantially in the words of the witness. To be 'substantially verbatim,' a document must contain a fairly comprehensive reproduction of the witness' words, and continuous, narrative statements made by the witness, and not merely fragmentary notes, jottings, scraps, or writings, or the agent's own interpretations or impressions."

Three cases from the Eighth Circuit, Karp v. United States (8 Cir.) 277 F. (2d) 843; Burke v. United States (8 Cir.) 279 F. (2d) 824; and Lewis v. United States (8 Cir.) 340 F. (2d) 678, hold that a report of one government agent to another, covering an interview with a defendant, constitutes a "statement" within the meaning of the act.

In McGill v. United States, 106 App. D. C. 136, 270 F. (2d) 329, the court held that notes taken by an officer and not submitted as a report are not producible. A different division of the same court a day later, in Borges v. United States, 106 App. D. C. 139, 270 F. (2d) 332, held that reports which were mere summaries and not verbatim notes of the interviews were not producible where the elapsed time between the interviews and the preparation of the summaries is uncertain.

While it appears that even the Federal courts have difficulty in interpreting the act and defining its limits in a twilight zone that exists between statements clearly producible and those clearly not producible, some guidelines are to be gathered from these decisions. We think it may be safely stated that (1) written statements made by a witness and signed or otherwise approved or adopted by him are producible; (2) reports made by an officer called as a witness by the prosecution, to another officer or the department for which he works, are producible; (3) a recording, whether prepared by stenographic, mechanical, electrical, or other method, or a transcript thereof, *shown* to be a substantially verbatim recital of an oral statement made by a witness to an investigator and recorded contemporaneously therewith or shortly thereafter is producible;[8] (4) notes or memoranda of an officer not shown to be a sub-

---

[8] Here there must be proof that the recording or transcription is a sub-

stantially verbatim recording of the witness' statement, or not approved or adopted by him, which contain statements or impressions or observations of the officer, are ordinarily not producible under the rule.

Applying these rules to the facts of the case now before us, it appears that there may be some question about the statement allegedly made by James Wilson. When questioned at the trial about the nature of the statement he gave to the police, Mr. Wilson testified as follows:

"Mr. Lindholm: The statement you gave to the police, did you give them a written statement or an oral statement?

"A—An oral statement.

"Q—Did you ever see it?

"A—No.

"Q—And did you ever sign it?

"A—No.

\* \* \* \* \*

"Q—Did you review anything in writing that was written down?

"A—No.

\* \* \* \* \*

"Q—And when did that interview take place?

"A—It was right after the shooting. Outside of Kline Olds."

Thus the necessary showing of a substantially verbatim reproduction of this oral statement is lacking.[9]

With respect to the reports of Officer Drassal and Detective Freischel, there seems to be no question that these reports were producible, at least

---

stantially verbatim reproduction of the witness' oral statement. This may frequently require extrinsic evidence. See Needelman v. United States (5 Cir.) 261 F. (2d) 802, holding that notes made by a government witness and used by him to refresh his recollection are not producible under the act, but a case report of the officer was. See, also, Tillman v. United States (5 Cir.) 268 F. (2d) 422. In Johnson v. United States (10 Cir.) 269 F. (2d) 72, the court held that a memorandum prepared by an officer, containing his interpretations and impressions after an interview with the witness, was not producible.

[9] Examination of the officer who took the statement may show it to be producible, or the statement may be producible if used by the witness to refresh his memory. See discussion of this rule, *infra*.

under the construction of the act by the Federal Circuit Courts of Appeal. There may seem to be some inconsistencies between the decisions of the various circuits, but there are explanations for these seeming inconsistencies. We think the rule followed generally is that stated by the Eighth Circuit in the three cases cited above. The reports of Drassal and Freischel under those decisions are clearly within the meaning of the act. A proper and sufficient demand was made for the reports, so defendant has protected his record. That it was prejudicial to refuse to produce these reports for the purpose of cross-examination or possible impeachment of the officers there can be no doubt. The conviction rests almost entirely on the identification of the defendant by Wilson and the officers who testified. There are many inconsistencies between the witnesses' descriptions of the person each saw, the clothes he wore, and his size. What is contained in the original reports of the police officers might well be inconsistent with what they testified to at the trial. For the purpose of testing the accuracy of their testimony these reports would be of great value to the defendant.

■ Where doubt exists as to the producibility of a "statement" a hearing should be held in camera to determine the question.[10] At such hearing a record should be made for use on appeal.

■ In addition to demanding specific statements and reports of witnesses, defendant procured a subpoena duces tecum requiring production of practically all of the records of the police department pertaining to this prosecution. The court on motion of the state properly quashed this subpoena except as to certain radio reports made at the time the officers were seeking to apprehend the perpetrator of the crime. Production of all the records of the police department surely doesn't come under the Jencks rule. Nor do we know of any other rule permitting such a fishing expedition. See, Carson v. Hawley, 82 Minn. 204, 84 N. W. 746.

■ Quite aside from the Jencks rule, there exists another rule that may be of importance here. Where a witness uses a memorandum or notes to refresh his recollection, his opponent has the right to demand to

---

[10] See, Campbell v. United States, 365 U. S. 85, 88, 81 S. Ct. 421, 423, 5 L. ed. (2d) 428, 433; Palermo v. United States, 360 U. S. 343, 79 S. Ct. 1217, 3 L. ed. (2d) 1287.

see such memorandum or notes. This question is exhaustively annotated in Annotation, 125 A. L. R. 19, and we will not try to discuss it comprehensively here. Since Chute v. State, 19 Minn. 230 (271), we have followed the rule that where a witness uses any paper or memorandum *on the stand* for the purpose of refreshing his memory the opposing party has the right to inspect such paper or memorandum, and to use it for cross-examination or impeachment. The question arises, does this rule apply where the witness refreshes his memory prior to being called to testify, and, if so, how close to the time he testifies must he have so refreshed his memory? McCormick recognizes the fact that most courts limit the right to inspect such memoranda to papers used by the witness at the trial, but he indicates approval of a rule that would require inspection of any memorandum used to refresh a witness' memory.[11] Wigmore was of the same opinion.[12]

If the witness relies on the memorandum or notes to refresh his recollection, and his testimony is based on such refreshed memory, we see no rational basis for distinguishing between a paper or memorandum referred to prior to the trial and one used while on the stand. In either case, the right to compare it with the witness' testimony rests on the same foundation. The only difference may be that in one case more foundation may be required, by showing what papers or memoranda the witness has examined; and in the other case the answer to this question is obvious because the paper or memorandum is present at the time the witness is testifying. But once it appears that the witness testifies from recollection refreshed by reference to papers or memoranda, the opponent of the party for whom the witness appears ought to be able to examine the paper to determine whether it is consistent with what the witness now says.

Care must be exercised, however, in the application of this rule so that material not used by the witness to refresh his recollection is excluded from the jury. See, Salo v. Duluth & I. R. R. Co. 121 Minn. 78, 140 N. W. 188.

■ Minn. St. 595.02(5) provides:

---

[11] See, McCormick, Evidence, § 9, p. 17.
[12] 3 Wigmore, Evidence (3 ed.) § 762.

"A public officer shall not be allowed to disclose communications made to him in official confidence when the public interest would suffer by the disclosure."

This statutory provision has no application here. Public interest is not jeopardized by disclosure of what a witness has formerly related to an officer concerning which he now testifies, because any confidential relationship existing would be lost by his testimony. Neither is public interest served by providing an unfair advantage to the prosecution by suppression of evidence that might test the truth of a witness' testimony.

■ Defendant also seeks to extend the Jencks rule to pretrial discovery. We see no need of discussing this contention as there was in this case no demand for pretrial discovery prior to the trial.[13]

Reversed and a new trial granted.

---

[13] For a discussion of the difference between production of a pretrial statement by a witness when he is called and pretrial discovery, see State v. Foster, 242 Ore. 101, 407 P. (2d) 901.