**STATE of Minnesota, Respondent,**

v.

**Bruce J. WEBBER, Appellant.**

**No. 48704.**

Supreme Court of Minnesota.

April 11, 1980.

C. Paul Jones, Public Defender, and Ronald L. Haskvitz, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., and Gary Hansen, Spec. Asst. Atty. Gen., St. Paul, Julius Gernes, County Atty., Winona, for respondent.

Heard before PETERSON, TODD, and SCOTT, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal from a conviction of first degree murder and conspiracy to commit murder in the first degree. We affirm.

The original venue was in Winona County, but the trial was held in the district court of Mower County after a motion by the defendant for change of venue was granted. Following the omnibus hearing, the state appealed to this court on the grounds that the trial court erred in suppressing testimony on the identification of the defendant and of a statement made by his alleged co-conspirator. In *State v. Webber*, 262 N.W.2d 157 (Minn.1977), this court refused to reverse the district court's suppression order.

Shirleen Howard's body was found in the basement of her home in Winona, Minnesota, on Saturday, August 13, 1977. The time of her death was established at sometime between 9 and 9:20 p. m. and the cause of death as two gunshot wounds in the head. Nothing in the home was disturbed or missing. The defendant, Bruce Webber, was convicted of committing this murder and conspiring with the victim's husband, Donald Howard, to commit the murder.

Webber and Howard met regularly during the winter before Shirleen Howard's death and telephone records showed frequent conversations between Webber's home in Illinois and Winona. Gun records from the Winona Coast to Coast Store operated by Howard indicated that five guns from its stock were transferred to Webber, including a Llama .45 automatic pistol believed to be the murder weapon.

Webber called Howard on Thursday, August 11, 1977, from Illinois. He then left his home with a male companion and arrived at Sara Smith's house in Rockford, Illinois, between 10 and 12 p. m. According to Ms. Smith, Webber asked to stay with her because he was trying to save hotel expenses while on his way to Winona to "do a job." The defendant had several relatives in Winona with whom he had stayed on previous visits, but he did not contact them while he was there on August 12 and 13, 1977. Webber and his companion checked into the Sterling Motel in Winona, where they reserved a room for both the 12th and the 13th. The beds in the room reserved by the defendant were slept in on the night of August 12 but not on the 13th.

Webber met with Donald Howard in a bar a block from the Coast to Coast Store on the afternoon of Friday, August 12. Testimony in the case provides details of Webber's activities on August 13. He essentially spent the day going from one bar to another with his friend. Webber allegedly told people that he was in the area to do some fishing. Between 4:30 and 8 p. m. the defendant and his male companion were accompanied by a woman. He was last seen that evening at around 8 p. m. in a

bar approximately one-half hour from Winona.

That same day, Donald Howard left his home at around 6:30 p. m. with his two daughters. They shopped for an anniversary present for his wife, made several visits at neighbors' houses, and stopped at an ice cream stand where they bought a malted milk for Shirleen. Howard and his daughters arrived home between 9:15 and 9:20. The two girls looked in the upstairs part of the house for their mother while Howard went into the basement, where he found Shirleen's body. He then returned upstairs and took the girls to a neighbor's house. Mr. Maloney, the neighbor, returned with Howard to his home and called the police after viewing the body. Witnesses' descriptions of Howard's reactions to his wife's murder were that he was rational and not in shock. He was, however, "shook."

At 2 a. m. on August 24, 1977, pursuant to a search warrant, police officers searched Webber's home in Illinois for a Llama .45, without success. At around 9 to 9:30 a. m. the same day, Officers Hafner and Fitzgerald spoke with the defendant at his work site. Webber admitted that he had owned a Llama .45 pistol, but maintained that he had lost the gun when it fell out of his pocket in a bar. Subsequent investigation uncovered the fact that Webber actually had lost a Colt .38 in the bar. The officers also asked whether he had been in Winona recently, to which he responded that he had been fishing in Wisconsin and may have crossed over to Minnesota.

On August 25, the police obtained a search warrant to search a package that was being sent to Webber. Under the proper authority of a search warrant, the postal inspector, with the help of the police, intercepted the package at the post office in Joliet, Illinois. The package was addressed to Bruce Webber and was sent by registered mail. The return label indicated the sender to be "D. Plein, Plaza East, Winona, Minn. 55927," but expert testimony established that the label was written by Howard and the receipt for the package was later found in Donald Howard's billfold.

The package contained a rolled-up magazine; within the magazine was $1,500, a woman's diamond ring, and a note saying, "Stay cool, call the store Tuesday, the 29th." The handwriting on the note was identified at trial as that of Donald Howard. After an inventory was made of the package and pictures taken of its contents, the items were covered with fluorescent detection powder. On August 26, the postal inspector personally delivered the package to the defendant at his home in Rockdale, Illinois. Defendant signed for the package and took it inside. About 5 minutes later, the inspector returned with police. They found Webber walking through his living room with the money from the package. In his pocket was the diamond ring. After searching the house and the premises the police found part of the package wrapping and the note torn in small pieces in the garbage can behind the house. The address portion of the wrapping was never found.

A witness, Norman Kostuck, testified that in the fall of 1976 he and Webber were working on a construction job together and that, during the course of general conversation, they discussed how to perform the perfect murder. They decided that the murder should be done in the early evening hours, after dark, on a Monday night. In order to muffle the sound of the gun, Kostuck suggested doing the shooting in the basement. He also speculated that the best way to send payoff money would be to wrap it in a magazine and send it through the mail. Later that fall, Kostuck waited for the defendant outside the Coast to Coast Store. When the defendant came out, he had a gun. He asked Kostuck if he would like to earn $5,000, and Kostuck inquired whom he would have to kill. The defendant replied that some people needed to be killed and, to illustrate, he put his finger to his head and said, "Blam, blam." The defendant later made a second offer of this nature to Kostuck.

The significant issues raised here are:

(1) Was there sufficient evidence to support the convictions?

(2) Did the trial court err in allowing the state to introduce evidence that the defendant possessed numerous guns?

(3) Were the records of the Coast to Coast Store showing the transfer of certain guns to the defendant by Howard admissible?

(4) Should certain identification testimony have been excluded on the basis of impermissibly suggestive pretrial lineup procedures?

(5) Did the trial court err in moving the trial to Mower County rather than Hennepin County?

■ 1. The evidence in this case shows that during the period before Shirleen Howard's death her husband met regularly with defendant and gave him several handguns and other Coast to Coast merchandise. Defendant spoke with Norman Kostuck about "the perfect murder," and many of the details they discussed became fact at the time of Shirleen Howard's death. On the same day that defendant received a gun from Howard, he sounded Kostuck out about committing a murder. After he moved back to Illinois he had repeated contact with Howard by telephone. The last call between the men was at 6:30 p. m. on August 11, 1977, and within hours defendant was on his way to Winona. En route, he told Sara Smith that he was going to Winona to "do a job." He did not stay with his relatives in Winona, but checked into a motel—which he did not use on August 13, even though he had paid in advance. The afternoon before the murder, defendant and Howard met in Winona bar. Howard entered the bar through the back door, and the men met privately in the rear, away from other patrons. On the evening of the murder defendant was last seen in Wisconsin about 8 p. m. at a location a half-hour from Winona. After the murder the police investigation revealed that a weapon of the same make as that used for the murder had been given to defendant by Howard. When defendant was confronted with this information, he told police he had lost the weapon in a Winona bar. Subsequent investigation showed that this was not true. He made other misstatements in denying that he had been in Winona except briefly and by claiming only passing acquaintance with Howard. The most significant evidence was the defendant's receipt of $1,500 and a diamond ring, along with a note written by Howard advising him to "stay cool" and to contact Howard later that week.

We find that the foregoing evidence is sufficient to sustain the conviction.

■ 2. The defendant claims the trial court erred in allowing the state to introduce evidence that the defendant possessed numerous guns, including a Colt .38, none of which was relevant to the case. To determine whether evidence is relevant, the issue is whether the evidence connects the defendant to the crime or is only admitted to create suspicion. *State v. Grunau*, 273 Minn. 315, 141 N.W.2d 815 (1966). We believe this test has been met and find no abuse of discretion on the part of the trial court in admitting the evidence. *State v. Swain*, 269 N.W.2d 707 (Minn.1978). The Colt .38 was relevant to show defendant was lying about losing the Llama .45. The following evidence complained of concerning guns was probative of the conspiracy between Howard and Webber: evidence of the transfer of the other guns; a chart of the guns transferred from the Coast to Coast Store; testimony that Webber once showed various witnesses guns; and evidence that Howard told his employee that Webber carried a gun.

■ 3. Defendant also complains about the admission of the Coast to Coast Alcohol, Tobacco, and Firearms Department (ATF) forms and Acquisition and Disposition (AD) forms. These records were admitted through the testimony of Dorothy Haner, a member of the Winona Police Department, and discussed by John Holubar, sergeant in the criminal investigation division of the Winona Police Department. In addition, a handwriting expert testified about the writings on the forms. The records were admitted through these sources because Donald Howard, the most likely custodian of the records, was charged with the same crime

and was "unavailable" as a witness. The other possible custodian, Nancy Brown, was being held on charges of aiding Howard in escaping and was "not available."

The trial court admitted the records as a statement of a co-conspirator in the furtherance of a conspiracy and, therefore, not hearsay under Minn.R.Evid. 801(d)(2). Defendant claims that it was not clear from the evidence whether Howard made the statements because the handwriting expert testified that Howard's signature was on the four ATF forms but could not positively identify his writing on any of the AD forms. Furthermore, an employee of the Coast to Coast Store testified that either he or Howard could have written the forms.

Although we agree that the foundation supporting the admission of the business records is weak, we find that admission of this evidence was not so prejudicial as to warrant reversal. *See, State v. LaJambe,* 300 Minn. 539, 219 N.W.2d 917 (1974). The records show a relationship between Howard and Webber supporting a conspiracy that is also apparent from other evidence such as the telephone records and Howard's employee's testimony.

4. In addition, defendant argues that the testimony of two witnesses at trial, Verna Mueller and Pauline Burros, should have been excluded because their identifications were based upon impermissibly suggestive pretrial lineups. Verna Mueller testified that defendant was the man who met Donald Howard in the Sunshine Bar in Winona on August 12, 1977. Pauline Burros identified defendant as the man who re-registered for a room at the Sterling Motel in Winona, where she was working as a desk clerk, on August 13, 1977.

The circumstances surrounding the pretrial identification of defendant by these two witnesses were explored at the omnibus hearing. Ms. Mueller was shown several photographs on August 24, 1977, including one of defendant taken several years earlier. She hesitated over defendant's photograph, but could not identify any of the subjects of the photographs as the man she had seen in the bar. Ms. Mueller stated that she was unable to identify defendant from his photograph because he looked quite different.

On September 17, Ms. Mueller identified the defendant in a lineup without hesitation. He was the only man in the lineup whose photograph had been shown to Ms. Mueller previously. The trial court held that although the lineup was impermissibly suggestive, under the circumstances there was no substantial likelihood of misidentification, and Ms. Mueller's identification was therefore allowed.

▇ To determine whether there has been a denial of due process, there must be a finding that the pretrial identification was unduly suggestive and that there was a substantial likelihood of irreparable misidentification. *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Defendant was the only man in the lineup whose photograph had been shown to Ms. Mueller. In *State v. Witt,* 310 Minn. 211, 213, 245 N.W.2d 612, 615 (1976), this court stated that such a procedure is unduly suggestive:

> [W]e do not condone these unnecessarily suggestive procedures. If suspicion has focused on a particular individual and his picture is shown to the complainant along with others but the complainant does not identify the picture, a subsequent lineup, even though otherwise proper, is open to question when that individual is the only person in the lineup whose picture has recently been shown to the complainant. It would be a better practice in such a situation to eliminate the use of photos and proceed directly to the lineup, or to include in the group of pictures shown at least one or more pictures of persons other than the suspect who also subsequently appear in the lineup.

Although the procedures used in Ms. Mueller's pretrial identification were properly deemed unduly suggestive in light of *State v. Witt, supra,* we find there was no denial of due process because there was no substantial likelihood of misidentification. Ms. Mueller viewed the defendant at close range when she served him two drinks

across the bar and saw him several times in a booth when she waited on Donald Howard. Since the bar was not busy, she remembered the details of her encounter with defendant quite accurately, including the brand of liquor he ordered and where he sat. She did not give the police a description of the man prior to the lineup, but she was quite certain when she identified defendant at the lineup. Ms. Mueller stated that she had hesitated to identify defendant from a photograph because she was not absolutely certain of the photograph. The lineup took place 33 days after the initial encounter. Although this may be considered a significant lapse of time, it is not by itself a violation of due process. *Neil v. Biggers*, 409 U.S. at 201, 93 S.Ct. at 383 (1972). Looking at the totality of these circumstances, we find that Ms. Mueller's identification was reliable and, therefore, her testimony was properly admitted even though the identification procedures were impermissible.

Ms. Burros identified defendant in a lineup on September 14, 1977, as a person who registered at the Sterling Motel on August 13. She was not shown any photographs prior to the lineup. However, Ms. Burros said that she thought the lineup wasn't quite fair because defendant's picture had been in the newspapers and on television. One of the police officers testified that she said at the time that she was comparing the lineup to a photograph she had seen of defendant in the newspaper. Defendant claims that this lineup was therefore impermissibly suggestive. The trial court concluded that if there was any suggestiveness it was due to pervasive publicity in the community, not to anything done by the state, and therefore defendant's claim could not be characterized as a due process challenge. The pervasive publicity was thus a factor to be weighed by the jury in assessing the credibility of Ms. Burros' identification and not a reason for exclusion.

The United States Supreme Court has implied that the concept of impermissibly suggestive procedures is addressed to police action: "The purpose of a strict rule barring evidence of unnecessarily suggestive confrontations would be to deter the police from using a less reliable procedure where a more reliable one may be available * * *." *Neil v. Biggers*, 409 U.S. at 199, 93 S.Ct. at 382. Although we do not hold that only if police misconduct is involved will a pretrial identification procedure be found to be impermissible, in light of this policy and the facts of this case, we affirm the trial court's ruling. Ms. Burros' identification was sufficiently reliable to be admitted as evidence. She stood across the motel counter from defendant and conversed with him while he registered, thus having ample opportunity to observe defendant. Her attention was focused on him during this period and she remembered the details of their conversation. She did not give a description of defendant to the police, but was confident of her identification of him in the lineup. She also testified that she had seen defendant's picture in a newspaper and was certain immediately that its subject was the man who had registered as Bruce Webber. The lineup occurred 32 days after Ms. Burros' original observation of defendant, but again, this length of time would not alone be a violation of due process. There was no substantial likelihood of misidentification.

5. The final issue requiring discussion is whether the trial court erred in moving the case to Mower County rather than Hennepin County. The trial judge's memorandum supporting his order changing venue explains that because of pretrial publicity in Winona he was of the opinion that there was a reasonable likelihood that defendant could not receive a fair trial in Winona. In deference to the preference for keeping cases in the district where the crime occurs and because of pretrial publicity in the Twin Cities, the court moved the case to Mower County rather than to Hennepin.[1]

---

1. Winona and Mower Counties are in the Third Judicial District and Hennepin is in the Fourth. Minn.Const. art. 1, § 6, states that the accused

has a right to a jury trial in the county or district where the crime occurred.

In reviewing appeals based on alleged errors in changing venue, it is well settled that the decision to change venue is in the sound discretion of the trial court and will only be overturned if the defendant carries the burden of showing a clear abuse of discretion. *State v. Gilbert,* 268 N.W.2d 576, 581 (1978). Stated another way, the evidence must be such that "a real possibility exists that a jury will not render an unprejudiced or unbiased verdict." *State v. Hogan,* 297 Minn. 430, 437, 212 N.W.2d 664, 669 (1973).

The basis of defendant's argument is that the voir dire in Mower County shows evidence of exposure of the jury to pretrial publicity which could have caused prejudice. A reading of the transcript of the voir dire does not persuade us that there was the "pattern of deep and bitter prejudice" that the United States Supreme Court found in *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). In introductory remarks to the prospective jurors, the trial court asked if any of them had heard about the facts of the case or formed an opinion which could not be set aside. He explained to the jurors that pretrial publicity must be ignored. Some prospective jurors, including members of the jury panel chosen, had heard or read about the case and recognized a few of the names involved, but none had formed a fixed opinion as to the defendant's guilt. Therefore, we find that the standard set out in *Hogan, supra,* has not been violated.

Having considered defendant's other arguments, we find them to be without merit, and therefore affirm.

Affirmed.