No. 63,121

STATE OF KANSAS, *Appellee*, v. JOHN A. SKELTON, *Appellant*.

(795 P.2d 349)

Opinion filed July 13, 1990.

*Steven R. Zinn,* deputy appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Thomas J. Robinson,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Robert T. Stephan* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a direct appeal from a jury verdict which found defendant, John A. Skelton, guilty of aggravated burglary (K.S.A. 21-3716), aggravated kidnapping (K.S.A. 21-3421), rape (K.S.A. 21-3502), and aggravated criminal sodomy (K.S.A. 21-3506). The jury did not reach a verdict on a second count of aggravated criminal sodomy, and the State dismissed this count at sentencing.

The defendant raises five issues on appeal: (1) His identification was tainted by suggestive pretrial procedures; (2) the evidence seized from his car was inadmissible; (3) the trial court failed to suppress evidence seized from defendant's house; (4) there was insufficient evidence to support the aggravated burglary conviction; and (5) the State's use of peremptory challenges violated defendant's Sixth Amendment rights. The determination of those issues necessitates a detailed recital of the facts.

On June 20, 1988, a burglary occurred at A.E.'s residence in Sedgwick County, Kansas. Shortly thereafter, A.E. installed a security system. Living with A.E. were his wife and 29-year-old

daughter, K.E. On July 28, 1988, A.E.'s wife left the house for work at about 7:20 a.m. As A.E. left at approximately 7:30 a.m., he noticed a dark Monte Carlo or Grand Prix with a chrome strip at the bottom being driven slowly near his house. As the cars passed, the drivers had eye contact. It appeared to A.E. that the driver of the other vehicle was slouched down in his seat. The driver was a white male with fairly long, dark hair. The license plate was an older-model Sedgwick County tag that A.E. thought began with an "R." Defendant's license tag was an older-model Kansas tag numbered S 56484.

K.E. activated the newly installed alarm system when she left for work at about 7:50 a.m. on July 28, 1988. As she approached her car, a man jumped out from behind the corner of the house and knocked her to the ground. When she struggled and screamed, he told her that he had a knife and showed it to her. When she asked what he wanted, he demanded money. Initially, K.E. saw the man face to face in the sunlight, but then he kept behind her. He told her that they were going into the house. As they entered, the security alarm sounded audibly, and an operator for the security alarm company spoke with K.E. on a speaker phone. K.E. intentionally gave a wrong code word twice, prompting the operator to increase the listening capacity and to call the police.

The assailant again demanded money, and K.E. dumped the contents of her purse but had only change. He took her into a bathroom, and she saw him in the mirror. He saw himself too, seemed surprised, and asked if she gave the right password. She told him "no" and urged him to leave because the police would arrive soon. He forced her to leave with him through the front door.

They walked over a small bridge and, while crossing a dirt field, K.E. started screaming. The man knocked her to the ground and hit her several times. When she agreed to "be good," he let her up and took her to an area with trees and grass. He ordered her to lie face down in the grass. When she did so, he ripped off her blouse, tied her hands behind her back with her bra, lifted her skirt, ripped off her underpants, and inserted a finger into her vagina. At trial, K.E. testified that he also inserted

a finger into her rectum, but she was uncertain in prior statements to the police about this conduct and the jury did not reach a verdict on Count 5, charging anal sodomy.

The man unzipped his pants and laid on top of K.E. but did not obtain an erection. He knelt in front of her and ordered her to lick his penis. When she refused, he hit her several times in the back of the head. K.E. pretended to be unconscious. He lifted her head by her hair and attempted to put his penis in her mouth. Although she kept her teeth clenched, he put his penis in her mouth and rolled it around on her gums. He again crawled on top of her, but he never obtained an erection and eventually left.

K.E. remained on the ground with her eyes closed, then stood up and saw her assailant walking west across the field. She ran to her house and told Wichita police officer Raymond Fletcher, who had responded to the call from the security company, that her assailant was still in the area. She described the man as a white male in his 20s, approximately 5'11", of muscular build with neck-length dark or black hair and a tattoo. In a statement to police, K.E. indicated that whenever she tried to look at her assailant, he would shove her face back down. At trial, K.E. testified she saw his face on three occasions: (1) when they first entered the house and she pointed out the alarm; (2) in the mirror when he pushed her against the bathroom vanity; and (3) over her shoulder when he was tying her hands together with her bra.

K.E. and Officer Fletcher got into his police car and followed a black Pontiac Bonneville or Parisienne that had just pulled out of a field heading north. A chase ensued with speeds up to 118 m.p.h. Officer Fletcher lost the vehicle as it headed east on 21st Street. Officer Phillip Gleason, who had arrived at the A.E. residence just as the car chase began, followed Officer Fletcher to 21st Street. He turned east onto 21st Street and observed a black car about one-half mile in front of him. Gleason saw the vehicle at 119th Street and then saw a dark vehicle turn south onto Sheffield. Gary Smarsh, a construction worker in the area, flagged Gleason down and reported that a black, four-door Pontiac had driven past him at a high rate of speed, left the blacktop road, and drove into a wheat field.

Photographs of tire tracks found in another field north of the residence were compared with photographs of tires on defendant's car. The tracks exhibited family characteristics similar to three of the tires. These characteristics did not exclude these tires as a possible source for the tracks, but individual characteristics were not available that would conclusively show the tracks were made by the tires on defendant's car. Later, A.E. and a witness to the high-speed chase observed defendant's car while it was parked in front of defendant's residence on N. Perry. Both testified that the car, a black Pontiac Bonneville, was similar to the one they had observed the morning of July 28.

Wichita police detective Richard Fesler interviewed K.E. on July 28. Following that interview, another police officer told Fesler that John Skelton was a possible suspect in the attack on K.E. On July 29, Fesler drove by Skelton's residence and saw his car parked in the driveway. It was clean, but some vegetation was hanging underneath it. On July 30, Fesler saw Skelton's car in the parking lot of the Bubba-Rock Club, which is a nightclub where Skelton was employed. This time, Fesler took samples of the green and brown vegetation from three places underneath the vehicle.

On July 29, Fesler showed K.E. six photographs, including a ten-year-old picture of defendant, but she did not identify any of the photographs as a picture of her assailant. A.E. was shown the same pictures but did not pick anyone.

Defendant was taken into custody and participated in an in-person lineup on August 1, 1988. Each of the six individuals in the lineup was required to say, "I have a knife." Although K.E. identified defendant as her assailant immediately upon entering the room, she waited until she had viewed each of the individuals carefully and listened to each speak before making her identification known.

William Wilson, who was being held in the Sedgwick County jail on 23 burglary and theft charges, participated in the lineup. He was previously acquainted with defendant through defendant's brother, and visited with defendant prior to the lineup. Wilson, in return for a favorable recommendation at his sentencing for the 23 charges, testified that defendant told him in a conversation before the lineup that defendant had been using cocaine the night

before the assault on K.E. and planned to break into the house to obtain money to pay his drug debts. According to Wilson, when K.E. tried to run away, defendant "felt like killing the bitch but he just wanted to degrade her." Defendant also told Wilson that a high-speed chase ensued and eventually he lost the police in Riverside Park.

Search warrants for defendant's car, which had been impounded, resulted in seizure of a screwdriver and a silver knife. Defense counsel moved to suppress K.E.'s identification of defendant during the lineup and at trial, as well as physical evidence seized from defendant's garage and his car. All the motions were denied.

Defendant, testifying at trial, denied any involvement in the attack of K.E. According to defendant, he worked at the Bubba-Rock Club until approximately 2:30 the morning of July 28 and then rode to the apartment of his friend, Dave Johnson. Around 4:00 to 5:00 a.m., defendant's girlfriend arrived, and they attempted to reconcile problems until she left at 7:00 a.m. Defendant slept on the floor until 11:00 a.m. Johnson drove defendant back to the Bubba-Rock parking lot to defendant's car. Defendant testified that the vegetation under his car was probably from his several camping trips to Cheney Lake during July. He denied the conversation with William Wilson before the lineup. Defendant testified that a suitcase and its contents, which had been stolen from the A.E. property in the June 20 burglary, and which was inadvertently found during execution of a search warrant of defendant's residence at 1028 N. Perry on June 27, 1988, was stored in defendant's garage by his friend, Carl Venz. Carl Venz and not the defendant was suspected of committing that burglary.

Following defendant's conviction, the State moved to invoke the Habitual Criminal Act based upon defendant's 1981 convictions for aggravated burglary, battery, and theft, and 1975 convictions for attempted rape, aggravated burglary, and robbery. The court granted the motion and sentenced defendant to terms of 15 to 40 years for aggravated burglary, three life sentences for aggravated kidnapping, and 45 years to two life sentences each for the rape and aggravated sodomy. The sentences for the latter three charges were ordered to run concurrently with each other

but consecutively to the sentence imposed for aggravated burglary. Additional facts will be discussed as necessary to determine the issues raised by the defendant.

Defendant first argues that K.E.'s identification of him both at the in-person lineup and at trial were tainted by use of suggestive procedures. On July 29, K.E. was shown a photographic array of six individuals. The array contained two black-and-white photographs of each individual, one frontal and one profile, for a total of 12 photographs. The photograph of defendant was ten years old. Neither K.E. nor her father identified defendant in the photo array.

Defendant was arrested on July 30; 1988. He appeared with five other individuals in an in-person lineup on August 1, 1988. These individuals were of a similar height and weight to defendant, as discussed by Office Fesler at trial. Mug shots of the six individuals in the lineup are also contained in the record on appeal.

At the time of the lineup, Detective Fesler asked each of the individuals to state, "I have a knife." Other than this comment, no one spoke during the lineup. K.E. identified the defendant. She indicated that she was "extremely certain" about the identification.

Defendant filed a motion to suppress the identification made at the lineup because he was the only individual there who had also been depicted in the photo lineup. In overruling the motion to suppress the identification, the court concluded that no evidence regarding the photos or the lineup was offered to suggest that a suggestion was made that a certain individual should be identified. Therefore, the court concluded that use of defendant's pictures in the photo array was not unduly suggestive and did not taint the lineup. In denying the motion for new trial on this ground, the court noted that, in viewing the photos contained in the array, the court would not have picked out the defendant based upon the ten-year-old picture and was not surprised that the victim did not do so on July 29, 1988.

A two-step approach is utilized to determine whether an eyewitness identification should be excluded. *Simmons v. United States*, 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968). Initially, a court must determine whether the procedure

used in making an identification was unnecessarily suggestive. If so, then the court must examine whether, under the totality of the circumstances, the impermissibly suggestive identification led to a substantial likelihood of irreparable misidentification which would deny due process. In *Manson v. Brathwaite*, 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977), the Court concluded that the admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process as long as the identification possesses sufficient aspects of reliability. The Court concluded "that reliability is the linchpin in determining the admissibility of identification testimony." 432 U.S. at 114.

To determine whether the photo array was unduly suggestive, resulting in a tainting of the lineup identification and the identification at trial, we must decide if the totality of the circumstances was so impermissibly suggestive that a very substantial likelihood of irreparable misidentification exists. *State v. Nesmith*, 220 Kan. 146, 147, 551 P.2d 896 (1976). Here, defendant was the only individual who was present at the in-person lineup whose picture was contained in the photo lineup. No Kansas cases address the exact issue presented here, but in *State v. Calvert*, 211 Kan. 174, 505 P.2d 1110 (1973), the defendant was placed in a lineup, viewed by witnesses of several robberies, but was not identified. A couple of months later, defendant was included in a second lineup. He was the only person to appear in both lineups; his counsel was present both times. Several of the witnesses viewed both lineups. 211 Kan. at 175-76. For a variety of reasons, defendant had three jury trials. In his direct appeal, defendant challenged the admissibility of the identification by State's witnesses who participated in the lineup proceedings because defendant was the only suspect at both lineups, and because defense counsel was not allowed to be present when lineup witnesses were interviewed. The court found no showing that any incident connected with the two lineups would substantially prejudice any of defendant's constitutional rights. The court did not discuss possible prejudice from the repetitious display of one suspect in more than one lineup. 211 Kan. at 178.

Second, even if the lineup proceedings might have been deficient, the in-court identifications could stand on their own. The

court examined the reliability of the in-court identifications, noting that the witnesses were in close proximity to the robber for at least three to four minutes and were able to describe his appearance in detail and with specificity. The court concluded that the trial testimony of the witnesses demonstrated that the in-court identifications were based upon observations of the defendant by the witnesses at the scene of the crimes and not due to repeated appearances in the lineup. 211 Kan. at 178.

Finding no Kansas cases discussing a photo lineup followed by an in-person lineup, defendant directs this court to several jurisdictions that have found such a procedure to be unduly suggestive. In *State v. Webber*, 292 N.W.2d 5 (Minn. 1980), one eyewitness was shown a photo array about two weeks after the events, which included a picture of the defendant taken several years earlier. The eyewitness hesitated over defendant's photo but did not identify any of the subjects of the photos as the man she had seen. Approximately three weeks later, she identified the defendant in a lineup without hesitation. Defendant was the only person in the lineup whose photograph had been shown to the witness previously. The Minnesota Supreme Court concluded that the procedure used was unduly suggestive, quoting from a prior decision as follows:

" '[W]e do not condone these unnecessarily suggestive procedures. If suspicion has focused on a particular individual and his picture is shown to the complainant along with others but the complainant does not identify the picture, a subsequent lineup, even though otherwise proper, is open to question when that individual is the only person in the lineup whose picture has recently been shown to the complainant. It would be a better practice in such a situation to eliminate the use of photos and proceed directly to the lineup, or to include in the group of pictures shown a least one or more pictures of persons other than the suspect who also subsequently appear in the lineup.' " 292 N.W.2d at 10 (quoting *State v. Witt*, 310 Minn. 211, 213, 245 N.W.2d 612 [1976]).

Although the court concluded that the pretrial identification was unduly suggestive, it held that due process was not denied because a substantial likelihood of misidentification did not exist, relying upon an analysis of the factors set forth in *Neil v. Biggers*, 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972). 292 N.W.2d at 10.

A similar approach was taken by the Supreme Court of Arizona in *State v. Via*, 146 Ariz. 108, 704 P.2d 238 (1985), where the eyewitness was unable to identify defendant from a photo lineup that contained a black-and-white photograph that was more than three years old, but later he identified the defendant at an in-person lineup. 146 Ariz. at 119.

Defendant here notes for the court a decision by the United States Court of Appeals for the Ninth Circuit concluding that the fact a defendant is the only individual common to a photo spread and a lineup cannot, "without further indicia of suggestiveness, render the lineup conducive to irreparable misidentification." *United States v. Davenport*, 753 F.2d 1460, 1463 (9th Cir. 1985). The decision in *Davenport* was relied upon by the Ninth Circuit in a case discussed by the State. In *U.S. v. Johnson*, 820 F.2d 1065, 1072-73 (9th Cir. 1987), the court concluded that the defendant looked sufficiently similar to the other individuals in the lineup, and the photograph was not so hazy as to provide further indicia of suggestiveness. Therefore, the court concluded that the lineup identifications were properly admitted and not tainted by a photo montage prior to the lineup. In making its decision, the court noted that "[w]hether a pretrial identification procedure is impermissibly suggestive is reviewed *de novo*." 820 F.2d at 1072 (citing *United States v. Bagley* 772 F.2d 482, 492 [9th Cir. 1985], *cert. denied* 475 U.S. 1023 [1986]).

The photo array here was displayed to the victim the day after the assault. At this time, defendant was not yet in custody although, apparently, the investigation had focused upon him. He was subsequently taken into custody and then, on August 1, was presented to the victim in an in-person lineup. The record contains no indication of when the photos of the other individuals contained in the photo array were taken, although the parties agree that defendant's picture was at least ten years old.

In determining whether this procedure was unduly suggestive, a review of the photographs themselves, particularly a comparison of the photographs contained in the photo lineup with those taken more recently of the defendant, indicates that the appearance of defendant has changed substantially. We agree with the trial judge that the ten-year-old photo of defendant bears little resemblance to the defendant as he looked at the time of the in-person

lineup. Clearly, the better procedure would have been to present a group of pictures that contained at least one or more pictures of persons other than the defendant who would also subsequently appear in the in-person lineup. The analysis by the Minnesota Supreme Court in *Webber* is sound; however, the facts here are distinguishable from those in *Webber*. In *Webber*, there was no indication that the photograph did not reasonably reflect the way defendant looked at the time of the in-person lineup. To be impermissibly suggestive, a photograph of a defendant must reasonably depict the defendant as he looked at the time of the in-person lineup. Here, the use of the outdated photograph of the defendant in the photo lineup did not make the subsequent in-person lineup identification impermissibly suggestive. We find nothing suggestive in the victim's viewing a photograph that does not reasonably resemble the defendant whom she subsequently identifies in an in-person lineup.

Defendant finally argues that K.E.'s identification at trial should not have been permitted in light of the suggestive confrontations that occurred prior to trial. Further, defendant argues the identification at trial was "tied directly to her identification of him at the lineup." Defendant recognized that this court has previously held that an in-court identification is capable of standing on its own even though a pretrial confrontation was deficient. *State v. Ponds*, 227 Kan. 627, 630, 608 P.2d 946 (1980). However, here, the only pretrial confrontations alleged by the defendant to be suggestive were the photo and in-person lineups. Since we have ruled the photo and in-person lineup procedures were not impermissibly suggestive, the in-court identification was not tainted by the pretrial lineup identification.

We conclude that neither the pretrial nor trial identifications were impermissibly suggestive, and, therefore, the identification of the defendant by K.E. was admissible.

Defendant next argues that soil samples and vegetation seized from the exterior of his car on July 30 were inadmissible because they were seized without probable cause and without a search warrant. This issue was raised in an amended motion to suppress evidence filed prior to trial on October 10, 1988. At the hearing conducted on October 14, 1988, Detective Fesler testified that, on July 29, 1988, he received information indicating that de-

fendant was the possible suspect in the assault against K.E. Fesler drove by defendant's house at 1028 N. Perry and saw defendant's car parked in the driveway. The officer noted that car matched the descriptions that had been given to him by various witnesses to the events occurring on July 28. The officer also noticed that the car had vegetation hanging underneath it. At the time, the officer was aware that the suspect vehicle had been involved in a high-speed chase which ended with the car driving through a wheat field.

The next day, July 30, Fesler went to the Bubba-Rock Club where defendant worked and observed defendant's car in the public parking lot. Fesler stated that his purpose for going to the lot was to collect soil and vegetation samples from the car. Fesler did not obtain a search warrant before going to the parking lot, but, once he arrived and saw vegetation under the car and soil on the hubcaps, he called another officer who met him at the lot and seized the samples. The judge who heard the evidence on the motion to suppress the vegetation held that the officer did not conduct a search but, instead, seized evidence that was in plain view. The court did not expressly rule upon the reasonableness of the warrantless seizure.

The State objects to this court's consideration of this issue because it was not specifically raised at trial. The State argues that, at trial, defendant objected to the introduction of the samples on "relevance grounds and also on grounds of [K.S.A.] 60-455." The State correctly notes that an issue that has not been raised before the trial court cannot be raised for the first time on appeal. *State v. Heck*, 8 Kan. App. 2d 496, 502, 661 P.2d 798 (1983). Furthermore, a timely objection must be made to the introduction of evidence, specifying the ground for the objection, in order to argue on appeal that the ground for admission of the evidence was erroneous. *State v. Bishop*, 240 Kan. 647, 659, 732 P.2d 765 (1987). Finally, the defendant cannot object to the introduction of evidence on one ground at trial and then assert a different objection on appeal. *State v. Clark*, 222 Kan. 65, 71, 563 P.2d 1028 (1977).

In *Douglas v. Lombardino*, 236 Kan. 471, Syl. ¶ 2, 693 P.2d 1138 (1985), we held: "When a motion in limine is denied, the moving party must object to the evidence at trial to preserve the

issue on appeal." In *State v. Nunn*, 244 Kan. 207, 213, 768 P.2d 268 (1989), we followed this ruling, stating:

"One of the reasons for the rule requiring an objection to the evidence during trial is clearly illustrated by this case. The judge at the hearing on the motion in limine, and again at the motion immediately preceding trial, had no way of knowing what the defense would be or whether intent and identity would be issues. The materiality of the proposed evidence may not become actually apparent until other evidence has been admitted. Here, the testimony of L.H. and N.H. was not presented until after the four young victims had testified. The court was then in a position to determine the similarity of the prior crimes and their relevance to the present case. Before Judge Watson, the entire argument was based upon the prejudicial nature of the proposed testimony."

In *State v. Chiles*, 226 Kan. 140, 144, 595 P.2d 1130 (1979), the defendant had argued in a pretrial motion to suppress that reference to a photographic identification should not be allowed during trial. The court first noted that appellant did not object to the testimony concerning the photographic identification at trial pursuant to K.S.A. 60-404 and, therefore, was precluded from asserting the issue on appeal. 226 Kan. at 144.

In *State v. Wilson*, 247 Kan. 87, 795 P.2d 336 (1990), the defendant argued that it was error to permit the witness, a social worker, to impermissibly vouch for the credibility of the child-victim. We held:

"No objection to this testimony was raised at trial. The issue was first presented to the trial court at the hearing on Wilson's motion for new trial in August 1988, more than one month after the trial. The erroneous admission of evidence may not be raised as an issue on appeal unless there appears of record a timely objection so stated as to make clear the specific ground of the objection. K.S.A. 60-404. Wilson may not raise this issue on appeal." 247 Kan. at 98.

Likewise, defendant Skelton cannot raise the issue on appeal here.

Moreover, even if the officer's prior viewing of the vegetation and soil does not fit within the requirements of the plain view exception, exigent circumstances that existed because the evidence was attached to a car that was mobile and, in fact, had been moved support the admission of this evidence under the automobile exception. In *Cardwell v. Lewis*, 417 U.S. 583, 41 L. Ed. 2d 325, 94 S. Ct. 2464 (1974), the United States Supreme

Court, in a plurality opinion, upheld the taking of paint samples from the exterior of defendant's car and the observation of the tread of a rear tire without a search warrant. Defendant had been questioned several times between the discovery of the victim's death on July 19, 1967, and defendant's arrest on October 10, 1967. The police were aware that defendant's car was believed to have been used in the commission of the murder. Defendant was asked to appear and complied by driving to the office and subjecting himself to interrogation. He parked his car in a public commercial parking lot a half block away. After defendant was arrested, his car keys were released to the police and a tow truck was dispatched to remove the car from the parking lot to the police impoundment lot. The next day, the car was examined by a technician. The tread from one tire was found to match the cast of a tire impression made at the scene of the crime. Paint samples from defendant's car were found to be of a consistent color, texture, and order of layering of paint with foreign paint found on the fender of the victim's car. 417 U.S. at 587-88.

The Court concluded that the limitation of the search·to examining the tread of tires and taking paint scrapings from the exterior of the vehicle left in a public parking lot did not infringe upon an expectation of privacy by the defendant. Therefore, the Court held that the warrantless examination of the exterior of the car was not unreasonable under the Fourth and Fourteenth Amendments where probable cause existed under the circumstances. 417 U.S. at 592.

The facts of this case fit within the plurality opinion in *Cardwell v. Lewis.* An attempt by the officer to intrude into the interior of the car would be prohibited without securing a search warrant. *State v. Sanders,* 5 Kan. App. 2d 189, 199-200, 614 P.2d 998 (1980). But here, no Fourth Amendment violation occurred in the seizure of the vegetation and soil from the exterior of the car under *Cardwell* because an individual has no reasonable expectation of privacy in the exterior of a car parked in a public lot. 417 U.S. at 591-92.

We further note that, had the admission of the vegetation and soil samples into evidence been error, it was harmless. In *State v. Eaton,* 244 Kan. 370, 385, 769 P.2d 1157 (1989), we stated: "Before error involving a federal constitutional right can be found

harmless, we must be able to declare our belief that the error was harmless beyond a reasonable doubt."

No scientific analysis was ever conducted to compare the samples from defendant's car with the soil and vegetation taken from the fields. During cross-examination of Detective Fesler, it was pointed out that the samples taken from the car appeared to be common vegetation that could be found throughout Kansas. The failure to conduct tests did not establish a definite connection between these samples and the vegetation from the area where the car involved in the chase had been. Furthermore, in his testimony, defendant explained that he often drove his car through vegetation when he went camping at Cheney Lake on weekends. Detective Fesler could testify concerning the soil and vegetation he observed on the defendant's car and use the samples to corroborate his testimony. Clearly, the introduction of this evidence was harmless error beyond a reasonable doubt.

Defendant next argues that the affidavit in support of the warrant obtained to search his residence on June 27, 1988, did not establish probable cause to believe that evidence of a crime would be found at that location. On June 28, 1988, Detective Harper submitted a three-page application for a search warrant for a duplex and unattached garage at 1028 N. Perry, where defendant resided. The property being sought in the application had been stolen during a burglary between June 22 and June 25. During execution of the warrant, the police came across a suitcase and items contained within that had been stolen during the June 20 burglary at A.E.'s residence. Prior to trial, defendant moved to suppress this evidence on grounds that the application for the warrant did not state facts sufficient to establish probable cause to believe that evidence of a crime would be found at defendant's residence. Defendant renews that argument and argues that the application did not state facts sufficient to meet the "good faith" exception of *United States v. Leon*, 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984).

As the State points out, the defendant made no objection to the introduction of the evidence at trial. The evidence in question was a photograph showing the suitcase and its contents, which had been taken in the burglary of A.E.'s residence, as it was found in the defendant's garage at 1028 N. Perry.

Here, as in the admission of the vegetation and soil samples, defendant raised this issue in his pretrial motion to suppress. At the hearing on the motion, evidence was introduced concerning this issue, and the trial court overruled the motion. Since no objection was made to the introduction of the photograph showing the suitcase and its contents, the defendant is precluded from raising this issue on appeal.

The next issue raised by the defendant is whether Count 1 of the complaint, charging aggravated burglary, and Instruction No. 7, listing the elements of aggravated burglary, violate due process by allowing the jury to find defendant entered or remained within the house with intent to commit aggravated robbery, rape, aggravated criminal sodomy, or theft when insufficient evidence existed to support a finding that defendant possessed an intent to commit rape or aggravated sodomy at the time he entered or remained inside A.E.'s house.

Count 1 of the complaint charges defendant with aggravated burglary of the A.E. residence as follows:

"[O]n or about the 28th day of July A.D., 1988, one John A. Skelton did then and there unlawfully, willfully, knowingly and without authority and with the intent to commit a felony, to-wit: Aggravated Robbery, Rape, Aggravated Criminal Sodomy or Theft enter into or remain within a building, to-wit: a residence . . . Sedgwick County, Kansas, occupied at the time by [K.E.]."

Jury Instruction No. 7 instructed the jury on the elements of aggravated burglary as follows:

"To establish this charge, each of the following claims must be proved:
"1. That the defendant knowingly entered into or remained within a residence located at . . . ;
"2. that the defendant did so without authority or obtained authority by use of force;
"3. that the defendant did so with the intent to commit a theft, or a felony which could include rape, aggravated robbery or aggravated sodomy therein;
"4. that at the time there was a human being occupying said residence; and
"5. that this act occurred on or about the 28th day of July, 1988, in Sedgwick County, Kansas."

The jury returned a general verdict of guilty on Count 1, charging aggravated burglary.

Burglary is defined as "knowingly and without authority entering into or remaining within any . . . [b]uilding, mobile home, tent or other structure, with intent to commit a felony or theft therein." K.S.A. 1989 Supp. 21-3715. Aggravated burglary merely requires the additional element that the place of the burglary be occupied by a human being during the course of the burglary. K.S.A. 21-3716; see *State v. Lora*, 213 Kan. 184, 187, 515 P.2d 1086 (1973). The information charging burglary is defective if it does not specify the ulterior felony intended by an accused in making the unauthorized entry. *Lora*, 213 Kan. at 187-88. An information charging burglary is defective in form unless the ulterior felony intended by the accused in making the unauthorized entry is specified, but this defect does not automatically result in prejudicial error. In *Lora*, this court noted:

"If the ulterior felony intended in a burglary is made clear at the preliminary hearing or by the context of the other charge or charges in the information the failure to allege the specific intended felony does not constitute reversible error. Such failure cannot result in surprise or be considered prejudicial to the defendant's substantial rights at the trial when the intended felony was made clear in advance of the trial." 213 Kan. at 188-89; see *State v. Maxwell*, 234 Kan. 393, 398, 672 P.2d 590 (1983),

The intent to commit a felony therein may be formulated after a defendant is within a structure, but the unlawful act of remaining without authority must concur with the criminal intent to commit a felony or theft to satisfy the statute's elements. *State v. Mogenson*, 10 Kan. App. 2d 470, 473-75, 701 P.2d 1339, *rev. denied* 238 Kan. 878 (1985).

Defendant argues that the aggravated burglary charge against him is "hopelessly muddled" because eight theories could possibly support this element of burglary. He could have entered the residence with the intent to commit one of the four listed offenses, or he could have formulated an intent to commit one of the four offenses while remaining in the residence. Defendant clarifies that he is not arguing that the complaint itself is defective, but that reversal is required because the State did not present sufficient evidence to establish that he intended to commit either rape or aggravated sodomy either while entering or after he was inside the A.E. residence.

In support of his argument, defendant directs this court to *State v. Garcia*, 243 Kan. 662, 763 P.2d 585 (1988), where the State alleged, in the alternative, that the felony murder occurred during the burglary of either a house or a pickup truck, but insufficient evidence was presented to find that the defendant had burglarized the truck. The general verdict returned by the jury made it impossible to determine which of the two alternative charges was relied upon by the jury in reaching its decision. This court recognized that the United States Supreme Court in *Stromberg v. California*, 283 U.S. 359, 75 L. Ed. 1117, 51 S. Ct. 532 (1931), concluded that a general verdict of guilty could not stand if the jury relied upon two or more independent grounds, one of which was insufficient. The appellant in *Stromberg* had been convicted of violating a California penal statute that condemned the display of a flag for one of three purposes. The jury was instructed that it could reach a verdict of guilty if proof beyond a reasonable doubt was established of any one or more of the three purposes. 283 U.S. at 364. The Court set aside the conviction, noting that the verdict did not specify the ground upon which it rested and, because three possibilities were presented, it was impossible to say under which clause of the statute the conviction was obtained. Because the first clause of the statute was invalid on its face, the conviction had to be set aside because it could have rested upon the first clause exclusively. 283 U.S. at 367-70.

In *Garcia*, we also quoted the Supreme Court's discussion of *Stromberg* in *Zant v. Stephens*, 462 U.S. 862, 881, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983), as follows:

" 'One rule derived from the *Stromberg* case is that a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground. The cases in which this rule has been applied all involved general verdicts based on a record that left the reviewing court uncertain as to the actual ground on which the jury's decision rested. See, *e.g.*, *Williams v. North Carolina*, 317 U.S. 287 [, 292, 87 L. Ed. 279, 63 S. Ct. 207] (1942); *Cramer v. United States*, 325 U.S. 1, 36 n.45 [, 89 L. Ed. 1441, 65 S. Ct. 918] (1945); *Terminiello v. Chicago*, 337 U.S. 1, 5-6 [, 93 L. Ed. 1131, 69 S. Ct. 894] (1949); *Yates v. United States*, 354 U.S. 298, 311-312 [, 1 L. Ed. 2d 1356, 77 S. Ct. 1064] (1957).' " 243 Kan. at 670-71.

We, therefore, must determine if sufficient evidence exists to support a conviction of the defendant of burglary with intent to commit rape or aggravated sodomy, either when he entered or while he remained inside the A.E. residence. The standard to be used in determining the sufficiency of evidence in a criminal case is whether the evidence, when " 'viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' " *Garcia*, 243 Kan. at 672 (quoting *State v. Van Cleave*, 239 Kan. 117, 121, 716 P.2d 580 [1986]).

When K.E. was initially confronted, her assailant demanded money. He then insisted that they enter the house. After they entered and K.E. gave a false password, pretending to deactivate the alarm system, the assailant again demanded money. K.E. dumped the contents of her purse but had only change. They next went into a bathroom, where the assailant was surprised to see himself in a mirror. He then learned that K.E. had not actually deactivated the alarm and indicated they would leave the residence. After he left, he forced her to accompany him into a wooded area away from the house where he sexually assaulted her.

Defendant argues that absolutely no evidence indicates he intended to commit a sexual act at the time he entered the residence, and this alone requires reversal of his aggravated burglary conviction. He further argues that no evidence indicates his intent to commit a sexual act existed while he remained within the residence. The only evidence from which an inference of intent can be drawn is his conduct in forcing K.E. into a bathroom and pushing her against a vanity. According to defendant, this conduct does not allow a finding beyond a reasonable doubt that defendant intended to commit any kind of sexual assault while in the residence. Furthermore, Wilson's testimony that defendant decided to "degrade" K.E. because she "tried to play me like a fool" shows that this intent to degrade her did not occur until after they were leaving the bathroom, and he learned that she had given a false password. Finally, defendant argues that nothing in the house indicated an intent to commit a distinct offense of aggravated sodomy, and that the events surrounding the sexual

assault established an intent to engage in sexual intercourse with the alleged act of aggravated sodomy being merely incidental thereto.

Unlike *Garcia,* the evidence presented in this case, when viewed in the light most favorable to the prosecution, would allow a rational factfinder to conclude beyond a reasonable doubt that K.E.'s assailant formed an intent to commit rape and/or aggravated sodomy while he remained within the house. Although commission of these acts occurred outside of the house, evidence was sufficient to enable a rational factfinder to conclude that the intent to inflict this insult on the victim arose while they remained in the house.

The statement by Wilson indicates that defendant formed the intent to degrade K.E. when she "tried to play me like a fool." This evidence indicates the intent to degrade K.E. arose when she and her assailant were in the house leaving the bathroom. Obviously, he could not remain in the house after learning that K.E. had alerted the security people. He immediately forced K.E. to leave the house and walk to the secluded area where he assaulted her. K.E. testified that, when they left the bathroom, they went out the front door, back toward her car, over a bridge, up into a field that was A.E.'s property, into another field that was dirt, and then headed back south. When they got into the other field, she started screaming because she hoped that the police had arrived at her house. Her assailant knocked her to the ground, forced her head into the dirt with one leg, and placed his other knee on the back of her neck. After hitting her several times, he let her get up when she indicated she would "be good." Once again, they proceeded toward a secluded area of trees and grass. When they reached this area, he ordered her to lie on her stomach and immediately committed the sexual assault upon her.

The directness with which he proceeded from the bathroom, through the house, into the field, and across to the secluded area without any hesitation is evidence that he had formulated the intent, while he remained in the house, to commit the sexual acts upon K.E. Sufficient evidence existed from which a jury could find that defendant either entered the house with the intent to commit robbery, rape, criminal sodomy, or theft, or formulated

the intent, while remaining in the residence, to commit robbery, rape, sodomy, or theft.

The fifth and final issue raises a Sixth Amendment challenge to the State's use of peremptory challenges to remove the only two black members from the jury panel. In his brief to this court, defendant noted that the identical issue was pending before the United States Supreme Court in *Holland v. Illinois*, 493 U.S. ____, 107 L. Ed. 2d 905, 110 S. Ct. 803 (1990), and the forthcoming decision would be controlling in the present case.

On January 22, 1990, the United States Supreme Court in *Holland* held that a white defendant's Sixth Amendment right to trial by an impartial jury was not violated by the prosecutor's exercise of peremptory challenges to exclude all black potential jurors from his petit jury. In reaching that decision, the majority stressed that the Court did not consider the equal protection claim that had been decided in *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), but, instead, considered only the Sixth Amendment right that a jury be drawn from a cross-section of the community. 493 U.S. at ____, 107 L. Ed. 2d at 921. At oral argument, defendant conceded that the decision in *Holland* was dispositive of the issue in this case. See *State v. Massey*, 247 Kan. 79, 795 P.2d 344 (1990).

The judgment of the district court is affirmed.