(837 P.2d 826)

No. 66,848

STATE OF KANSAS, *Appellee,* v. EDWARD E. HOLLOMAN, *Appellant.*

Opinion filed July 31, 1992.

*Helen Pedigo*, legal intern, *Elizabeth Sterns*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, for the appellant.

*M. Jennifer Brunetti*, assistant district attorney, *Gene M. Olander*, district attorney, and *Robert T. Stephan*, attorney general, for the appellee.

Before BRAZIL, P.J., DAVIS, J., and KAREN M. HUMPHREYS, District Judge, assigned.

DAVIS, J.: The defendant, Edward E. Holloman, appeals his robbery conviction, claiming that the court should have excluded eyewitness identification testimony because the police procedures used were impermissibly suggestive. He also contends that the failure to give a lesser included offense instruction and a burden of proof instruction on alibi defense requires reversal. Finally, he claims the evidence is insufficient to support his conviction. We affirm.

On January 25, 1991, about 1:30 p.m., The Gap store in White Lakes Mall shopping center was robbed. The assistant manager, Amy Snow, was the only employee working that day. Just before the robbery, Snow saw an individual walk by the front of the store. She became suspicious because he had on sunglasses and a stocking cap and did not look like most of the people who normally shop at the mall. She was going to call the mall security but did not when the person proceeded on. Shortly thereafter, the robber came around the corner into the store and stated he had a gun and would shoot her if she did not give him the money

or if anyone came in during the robbery. He also counted backwards from ten to one while waiting for the money. Snow gave the robber a money bag containing $225 in currency. After the robber left the store, she called security.

Two off-duty police officers, Sergeant Gary Harmon, who was working security at the mall, and Corporal Frank Gregg were at the mall when the call came through. They spoke with Snow, who told them a black male with a blue stocking cap and blue jeans had robbed the store. She stated he had left the mall through the southwest doors. Snow also told the police that the robber wore a black cotton jacket zipped up the front, mirror-like sunglasses that looked like ski goggles, a dark stocking cap with red and white stripes at the bottom, denim blue jeans, and a black glove on the left hand. She told the officers that the robber smelled like cooking grease and had a soft voice with a kind of nasal, black accent.

Officers Gregg and Harmon left the mall by the southwest doors and found one set of fresh shoe prints in the snow leading away from the mall. They continuously followed the prints, arriving at 1014 Southwest 33rd Street, where the shoe prints stopped. Other officers and law enforcement units responded to the area and helped to set up a perimeter around the residence to observe anyone entering or leaving the residence.

Bertha Holmes, one of the residents of the house and defendant's mother, gave her consent for the police to search the premises. Defendant and his girlfriend, Tonya Brown, were also present at the time of the search. During the search, officers seized a pair of extremely wet tennis shoes with a tread pattern similar to those of the tracks they had been following, a black zippered cloth jacket, a brown zippered Merchants Bank money bag containing $225 in the same denomination of currency as Snow had given the robber, a pair of white goggle-type sunglasses, blue jeans that were wet to the knees, a glove, a wet grey jacket, and a stocking cap with two holes cut in it. Defendant was arrested, taken to police headquarters and *Mirandized*. Shortly thereafter, Snow was brought to the police station to identify the items seized and the defendant.

At the station, Snow was informed by the police that they had recovered the money and had arrested the suspect. They showed

her the items seized and allowed her to smell the clothes seized. They told her that they had taken the money bag and clothes from the person they had arrested. The police also showed Snow the suspect on a television monitor and told her that the person on the television monitor was the person arrested. After viewing defendant for four to five minutes and listening to him talk, Snow identified him as the robber.

A complaint was filed charging the defendant with one count of robbery. The defendant filed a motion to suppress Snow's pretrial identification and the resulting in-court identification. The defendant further filed a notice of alibi defense. The defendant's motion to suppress was denied and the defendant was convicted by a jury of one count of robbery. He was sentenced to 4-15 years and now appeals.

### Eyewitness Identification

Defendant argues that Snow's pretrial identification was impermissibly suggestive, tainting the in-court identification, and that the trial court erred by not suppressing both identifications. He argues that her description to the police was highly suspect and that her later identification was based on the suggestive circumstances and comments made by the police and not her own independent observations. Defendant contends that Snow's identifications contradicted her earlier descriptions, thereby calling the validity of the identification into question.

"A two-step approach is utilized to determine whether an eyewitness identification should be excluded. *Simmons v. United States*, 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968). Initially, a court must determine whether the procedure used in making an identification was unnecessarily suggestive. If so, then the court must examine whether, under the totality of the circumstances, the impermissibly suggestive identification led to a substantial likelihood of irreparable misidentification which would deny due process." *State v. Skelton*, 247 Kan. 34, 39-40, 795 P.2d 349 (1990).

When considering whether an unnecessarily suggestive identification procedure would lead to a substantial likelihood of misidentification, the court looks to the five factors set out in *Neil v. Biggers*, 409 U.S. 188, 199, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972):

"the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200.

These five factors were considered in *State v. Alires*, 246 Kan. 635, 639, 792 P.2d 1019 (1990).

In this case, the trial court determined that the procedures utilized by the Topeka Police Department were not unnecessarily suggestive and, therefore, denied defendant's motion to suppress the victim's testimony. In this respect, we believe the trial court erred.

Improper procedures for displaying a suspect to an identifying witness such as a one-person show-up, one-on-one confrontation, a lineup or photo array wherein the suspect stands out because the other persons displayed do not have similar characteristics as the suspect, all tend to increase the possibility of eyewitness misidentification. The United States Supreme Court has held:

"A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. *The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime.* Regardless of how the initial misidentification comes about, the *witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.*" (Emphasis added.) *Simmons v. United States*, 390 U.S. 377, 383-84, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968).

The eyewitness in this case saw the robber for approximately 30 seconds as he walked in front of her store before the robbery and approximately one minute during the robbery. When he first walked by the store, she noticed that he was wearing a stocking cap and had sunglasses on but could not see his face. During

the robbery, she could not see anything but the robber's chin and lips because the stocking cap was pulled way down and the sunglasses covered a large portion of his face.

The eyewitness was brought to the police station a little over an hour after the robbery to identify both the items seized and the defendant. Only the defendant and the interviewing officers were on the television monitor. The eyewitness was never asked to observe or identify any other possible suspects. In essence, the defendant was identified through a one-person show-up. "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno*, 388 U.S. 293, 302, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967).

In *Stovall*, the single person show-up was permissible because of exigent circumstances. The eyewitness was in critical condition in the hospital and it was impossible for the witness to go to the jail. 388 U.S. at 302. The Supreme Court held that the police, faced with the responsibility of identifying the attacker and the need for immediate action, under the circumstances undertook the only procedure possible. 388 U.S. at 302. In this case, there is no evidence of record of exigent circumstances. The witness was allowed to view the defendant on a television monitor. She was told that the police had recovered the money from the person arrested and that the arrested person was the party she was viewing. The witness was also told that the clothes she had been previously shown had been taken from the defendant. Contrary to the trial court's conclusion, we believe that the above factors render the procedure used by the Topeka Police Department in making the identification unnecessarily suggestive.

Under the second prong of *Skelton*, the question which we must examine is whether, under the totality of the circumstances, the impermissibly suggestive identification led to a substantial likelihood of irreparable misidentification which would deny the defendant due process. *Skelton*, 247 Kan. at 40. The answer to this question involves consideration of the five *Biggers* factors set forth in 409 U.S. at 199-200; *State v. Alires*, 246 Kan. at 639.

(1) The opportunity of the witness to view the criminal at the time of the crime. Snow saw the robber twice, once for approximately 30 seconds when he walked by the store. At this time,

she could not see his face, but her attention was drawn to him because he had on sunglasses, a stocking cap, and a light coat, and he did not look like the people who normally shop at the mall. She again saw the robber when he came into the store to demand money. This time, she could see only his chin and lips because his eyes and the rest of his face and head were covered by the stocking cap and the sunglasses. The robbery lasted approximately one minute.

(2) The witness' degree of attention During the robber's first 30-second walk-by, the witness observed his clothing and eyeglasses, not his face. During the robbery, Snow could see only part of the robber's face and the items of clothing he wore. During this period, her attention was partially directed towards the safe, which she tried to open three times. While she was opening the safe, the robber squatted down beside her, and at this time, she noticed he smelled like cooking grease. She also heard his voice as he spoke and counted backwards from 10, later saying that he had a soft voice with a kind of nasal, black accent. Her degree of concentration at the time was such that it allowed her to select a source of cash within the store containing the least amount of money.

(3) The accuracy of the witness' prior description of the criminal. Snow described the robber as a light-skinned black person approximately six feet tall, 150 to 160 pounds, with full lips, a soft, black, nasally voice and between the ages of 18 to 20 years old. She could not see his face, but described him as smelling of cooking grease and wearing a black cotton jacket zipped to the waist, mirror-like sunglasses resembling ski goggles, denim blue jeans, a black glove on his left hand, and a dark or blue-colored stocking cap with red and white stripes along the bottom. The stocking cap seized was navy in color and did not have any red or white stripes on it. However, there was some evidence indicating that what she saw was a scarf containing red stripes. She was not positive that the stocking cap shown to her was the one the robber wore. She did recognize the sunglasses, the smell of grease on the blue jeans the police had seized, and the coat worn by the robber. While she thought the robber wore a black leather glove on his left hand, the glove found by the officers had a leather-like vinyl on the top portion of the glove only.

In response to the eyewitness' testimony concerning the smell of grease, the defendant testified that, although he had once worked as a dishwasher at a Red Lobster restaurant, he had not done so for almost a month. Further, the defendant was 30 years old at the time of the robbery.

(4). The level of certainty demonstrated by the witness at the confrontation. Snow testified that she did not see the face of the robber at the time of the robbery. At the time she looked at him on the monitor, he was not wearing any of the clothes the robber wore because the police had previously seized them and asked Snow to identify them. She testified at the suppression hearing that she was able to identify the defendant by his voice, by the smell of the clothing she was shown, and by the bag of money that was shown to her by the police. Snow had viewed the defendant for three to five minutes prior to her identification at the police department, listening to him talk and count backward from 10 before identifying him by voice.

Snow identified the defendant at trial as the robber. After hearing the brother of the defendant, Phillip Holloman, who was alleged to have found the money bag and brought it to the residence, and the defendant count backwards from 10 at trial, Snow reaffirmed that the defendant was the robber.

Voice identification by a lay witness is permitted in Kansas "provided only the witness has some basis for comparison of the accused's voice with the voice which he or she identifies as the accused's." *State v. Weigel*, 228 Kan. 194, 199, 612 P.2d 636 (1980). She also identified defendant's sunglasses, his blue jeans, and his black zippered coat as those the robber had been wearing.

(5) The length of time between the crime and the confrontation. Snow viewed the defendant on the television monitor a little over an hour after the robbery. Testimony revealed that after observing the defendant on the television monitor, Snow appeared 95% certain that he was the robber.

If the identification possesses sufficient aspects of reliability, the procedure used, although unnecessarily suggestive, does not violate due process. "[R]eliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 114, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977). "The purpose of a strict rule barring evidence of unnecessarily

suggestive confrontations would be to deter the police from using a less reliable procedure where a more reliable one may be available," not because in every instance the admission of evidence of such a confrontation offends due process. *Biggers*, 409 U.S. at 199.

Despite the police procedures used in this case, we believe that the victim's identification of the defendant possesses sufficient aspects of reliability. The victim used the voice and clothes as aids in her identification. She demonstrated a reliable degree of certainty regarding her voice identification. Her description of the defendant at the scene, while not perfect, possessed sufficient aspects of reliability to guarantee due process. While her attention was diverted by the opening of the safe, she did have a brief time to look directly at the defendant and use this observation time to aid her in her identification.

What is protected is an evidentiary interest of the defendant. The United States Supreme Court has recognized the limited extent of that interest in our adversary system. In *Manson*, the United States Supreme Court notes this limited interest:

" 'In essence what the *Stovall* due process right protects is an evidentiary interest . . . .

" 'It is part of our adversary system that we accept at trial much evidence that has strong elements of untrustworthiness—an obvious example being the testimony of witnesses with a bias. While identification testimony is significant evidence, such testimony is still only evidence, and, unlike the presence of counsel, is not a factor that goes to the very heart—the "integrity"—of the adversary process.

" 'Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi.' " 432 U.S. at 113-14, n.14 (quoting *Clemons v. United States*, 408 F.2d 1230, 1251 [D.C. Cir. 1968], *cert. denied* 394 U.S. 964 [1969]).

In this case, the cross-examination by defense counsel of the police officers and the victim was effective and extensive. All weaknesses of the identification by the victim and others testifying were thoroughly exploited by counsel. The jury was instructed specifically to view eyewitness identification with caution. We conclude that the defendant was not denied due process by reason

of the unnecessarily suggestive procedure employed by the Topeka Police Department in making an identification.

We further note that the jury in this case deliberated over an extended period of time. Other circumstantial evidence tied the defendant to the crime charged. The jury was required to and did deal with the defendant's alibi defense as well as defendant's brother's testimony that he found the money bag on the way home from the shopping mall.

We in no way condone the identification procedures used by the Topeka Police Department. However, after reviewing the record, we conclude that the victim's identification possesses sufficient aspects of reliability to be considered under proper instructions to the jury. We cannot say under the totality of the circumstances in this case that there is a very substantial likelihood of irreparable misidentification. "We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Manson*, 432 U.S. at 116.

### Instruction on Lesser Included Offense

The defendant argues that, under the facts of this case, the trial court was required to give a lesser included offense instruction on theft. While theft is a lesser included offense of robbery, *State v. Patterson*, 243 Kan. 262, 266, 755 P.2d 551 (1988), the evidence did not warrant such an instruction.

Evidence was presented to show a robbery had taken place. The victim testified that the robber had threatened to shoot her if she did not give him the money. She gave him the money bag containing $225 and the money was recovered from the defendant's residence.

The defendant, however, denied having robbed the store. He denied he ever went to White Lakes Mall and testified that he had never seen the money bag until the police arrested him. He stated that he had been at the bowling alley and the B. Dalton's bookstore at the time of the robbery. In support of his position that he did not rob The Gap and knew nothing about the robbery or money bag, the defendant presented evidence from his mother,

Bertha Holmes, and his brother, Phillip Holloman, that Phillip had found the money bag when he was walking home.

To be guilty of theft, the defendant must have intended to exercise unauthorized control over the property with an intent to permanently deprive The Gap of its use, possession, or benefit. K.S.A. 21-3701. Defendant contends that because he denied knowing about the robbery, offered evidence that someone else committed the robbery, and presented evidence that his brother accidentally found the money bag and brought it home, he could not have manifested the required intent for theft.

### Burden of Proof Instruction
### in Alibi Defense

The defendant argues that his alibi was an affirmative theory of defense which required the giving of a separate instruction under PIK Crim. 2d 52.08. However, the defendant did not object to the trial court's decision not to give the requested instruction. Nor did the defendant object when the trial court gave the jury the instructions which omitted defendant's proposed instruction.

"A party may not assign as error the giving or failure to give an instruction unless he objects to the instruction stating the specific grounds for the objection. Absent such objection, an appellate court may reverse only if the trial court's failure to give the instruction was clearly erroneous. [Citations omitted.] The failure to give an instruction is clearly erroneous only if the reviewing court reaches a firm conviction that if the trial error had not occurred there was a real possibility the jury would have returned a different verdict. [Citation omitted.]" *State v. DeMoss*, 244 Kan. 387, 391-92, 770 P.2d 441 (1989).

See *State v. Perkins*, 248 Kan. 760, 770, 811 P.2d 1142 (1991); *State v. Harper*, 246 Kan. 14, 25, 785 P.2d 1341 (1990); *State v. Land*, 14 Kan. App. 2d 515, 517, 794 P.2d 668 (1990).

The committee on PIK instructions has recognized that an alibi defense is not a true affirmative defense. In *State v. Peters*, 232 Kan. 519, 656 P.2d 768 (1983), the Supreme Court reaffirmed the recognition in PIK Crim. 2d 52.19 that an alibi defense instruction not be given. 232 Kan. at 520. In reaffirming that recommendation, the Supreme Court quoted the PIK comment, stating:

" 'Alibi is not an affirmative defense, as is entrapment or insanity; it consists only of evidence showing that the defendant was not present at the time or place of the crime. This evidence should be considered as all other evidence. If an instruction is given, attention is called to the defendant's alibi, which connotes a burden not found in the law.' " 232 Kan. at 520.

"[T]he danger in instructing separately relative to the defense of alibi lies in the almost insurmountable difficulty of avoiding connotation of some burden on the accused to prove the defense. Accordingly we hold that a separate instruction on the defense of alibi is not required where adequate and proper instructions are given on the elements of the crime charged and on the prosecution's burden to prove guilt beyond a reasonable doubt." *State v. Skinner*, 210 Kan. 354, 361, 503 P.2d 168 (1972), *overruled on other grounds State v. Wilkins*, 215 Kan. 145, 156, 523 P.2d 728 (1974).

See *State v. Dailey*, 228 Kan. 566, 570, 618 P.2d 833 (1980); *State v. Suing*, 210 Kan. 363, 364, 502 P.2d 718 (1972).

A review of the trial record reveals that the jury was instructed on the elements of the crime charged and the fact that the law placed a burden of proof on the State to identify the defendant, setting out various factors the jurors should consider when weighing the reliability of the State's eyewitness identification testimony. That instruction specifically informed the jury that the defendant did not have to prove that he had been wrongly identified. Instuction No. 3 informed the jury that it was to presume the defendant was innocent and that the State had the burden of proving the defendant guilty. Although Instruction No. 3 did not specifically state that the State has the burden of proving the defendant guilty beyond a reasonable doubt, it did tell the jurors the test they were to use: "If you have a reasonable doubt as to the truth of any of the claims made by the State, you should find the defendant not guilty. If you have no reasonable doubt as to the truth of any of them, you should find the defendant guilty." The test described by the trial court adequately informed the jury of the need to find the defendant guilty beyond a reasonable doubt. Lastly, Instruction No. 4 informed the jury that it had to find criminal intent on the part of the defendant to find him guilty. The instruction went on to describe criminal intent as conduct of the accused that was willful, *i.e.*, purposeful and intentional and not accidental.

The instructions given by the trial court adequately set out the elements of the crime charged and informed the jury of the State's

burden of proof and the jury's need to find the defendant guilty on each claim beyond a reasonable doubt. The trial court's refusal to give the proposed alibi instruction is not clearly erroneous and is not a basis for reversal.

## Sufficiency of Evidence

"When the sufficiency of the evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Graham*, 247 Kan. 388, 398, 799 P.2d 1003 (1990).

After a review of all the evidence, viewed in the light most favorable to the prosecution, we are convinced that the jury could have found the defendant guilty beyond a reasonable doubt.

Affirmed.